## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **T.R., et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **No. 15-4782** |
| | : | |
| **SCHOOL DISTRICT OF PHILADELPHIA,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**Goldberg, J.**                                                                               **November 30, 2016**

### Memorandum Opinion

Plaintiffs filed this putative class action alleging that the School District of Philadelphia ("School District") provides inadequate translation and interpretation services to limited English proficient ("LEP") students with disabilities and their parents. Plaintiffs assert that this failure deprives students and their parents of the ability to meaningfully participate in the Individualized Education Program ("IEP") process. Plaintiffs contend that the School District's actions violate the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act, Americans with Disabilities Act, 22 PA §§ Code 14-15, the Equal Education Opportunities Act and Title VI of the Civil Rights Act of 1964.

Presently before me is the School District's motion to dismiss Plaintiffs' Complaint. For the following reasons, I will deny the School District's motion in its entirety.

## I.     FACTUAL BACKGROUND AND STATUTORY FRAMEWORK

As it is necessary to understand the basis of Plaintiffs' claims, the relevant portions of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and related regulations are discussed briefly below.

### A.  IDEA Framework

Under the IDEA, any state that receives federal educational funding must provide children within that state with a "free appropriate public education" ("FAPE"). See 20 U.S.C. §§ 1412(a)(1)(A), 1401(9). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Bd. of Educ. v. Rowley, 458 U.S. 176, 188-89 (1982). The IDEA "contemplates that school districts will achieve these goals by designing and administering a program of individualized instruction for each special education student set forth in an Individualized Education Plan." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)).

An IEP is a "written statement for each child with a disability that is developed, reviewed, and revised" by the student, school district personnel and the student's parents. 20 U.S.C. § 1414(d)(1)(A)(i), (B); 34 C.F.R. §§ 300.320-324. Parents must be given a copy of the IEP at no cost to the parents. 34 C.F.R. § 300.332(f).

In order to conduct an initial evaluation of a student or begin the provision of special education services, a school must obtain written parental consent. This consent requires that the parent "has been fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or through another mode of communication." 34 C.F.R. § 300.9(a),(b) (emphasis added).

The IDEA requires that the parent(s) of a student with a disability be invited to each IEP team meeting and afforded an opportunity to participate. 20 U.S.C. § 1414; 34 C.F.R. §§ 300.321, 327, 501(c). To that end, the school is required to notify "parents of the meeting early enough to ensure that they will have an opportunity to attend and inform the parents of the purpose of the meeting and who will be present." 34 C.F.R. § 300.322(b)(1)-(2).

The IDEA contains procedural safeguards designed, in part, to ensure "that families of such children have meaningful opportunities to participate in the education of their children at school and at home." 20 U.S.C. § 1400(c)(5)(B). For example, the school "must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English." 34 C.F.R. § 300.322(e).

Additionally, students suspected of having a disability must be evaluated "in the child's native language or other mode of communication and in the form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to so provide or administer." 34 C.F.R. § 300.324(a)(2)(ii); see 20 U.S.C. § 1414(b)(3)(A) (emphasis added).

The IDEA also requires that parents of students with disabilities receive prior written notice before a school proposes to initiate or change or refuses to initiate or change "the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3). The IDEA mandates that schools develop "[p]rocedures designed to ensure that [this notice] is in the native language of the parents, unless it clearly is not feasible to do so." Id. § 1415(b)(4). In Pennsylvania, the form

used to provide prior written notice is called a Notice of Recommended Educational Placement

("NOREP").

### B. Factual Allegations

The following factual allegations are taken from the Complaint:[1]

− T.R. and A.G. are students in the School District. Both students have learning disabilities and are limited English proficient ("LEP"). T.R.'s mother, Barbara Galarza, and A.G.'s Guardian, Margarita Peralta, are also both LEP. Spanish is the native language of the four named Plaintiffs. (Compl. ¶¶ 2, 16-19.)[2]

− As of November 2013, the School District reported that there were approximately 25,900 families whose primary home language was not English and that approximately 19,760 families had requested documents in a language other than English. During the same time period, the School District's records indicate that 1,887 students with IEPs had a home language other than English. (Compl. ¶¶ 42, 51-52.)

− During the 2012-2013 school year, only 487 special education documents of any type were orally interpreted. The School District's interpretation services are provided primarily by approximately 55 Bilingual Counseling Assistants. These individuals, however, do not provide translation services. (Compl. ¶ 53.)

− During the 2012-2013 school year, the School District employed an outside contractor that may have translated some special education documents. However, as of the 2013-2014 school year, the School District no longer employed this outside contractor. Additionally, the Translation and Interpretation Center, an internal department within the School District, never translated an IEP in its entirety.[3] (Compl. ¶¶ 51-54.)

− Despite knowledge of the foregoing, the School District has adopted a policy in which it fails to timely and completely translate IEPs, NOREPs, evaluations, re-evaluations, progress reports, assessments and other IEP process documents for LEP students with

---

[1] When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assume the veracity of all well-pleaded facts found in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). For purposes of deciding the instant motion, I assume that all facts found in the Complaint are true.

[2] The School District has not challenged the sufficiency of the Complaint's allegations as they pertain to the individual claims brought by the named Plaintiffs. As such, I have not set forth those allegations.

[3] The School District disputes the veracity of this allegation. (Def.'s Reply p.3 n.2.) However, at this stage of the proceedings, I must accept this allegation as true.

disabilities and their parents. The School District also has failed to provide translated evaluations and re-evaluations to parents at least ten school days prior to IEP team meetings. (Compl. ¶¶ 55-56.)

- Although the School District has attempted to provide some interpretation services during IEP team meetings, those efforts have been sporadic and incomplete. Additionally, the School District has failed to conduct evaluations of LEP students in their native language. (Compl. ¶ 57.)

In light of the above allegations, Plaintiffs urge that LEP parents have been denied "their right to informed consent, notice, decision making regarding program and placement, and meaningful participation in the IEP process, including IEP team meetings." Plaintiffs further urge that LEP students have been denied "equal educational opportunities to participate fully and equally in the IEP process and in the District's educational programs" as well as the ability to "receive adequate IEP-related services" and a FAPE. (Compl. ¶¶ 57-59.)

### C. Claims

Plaintiffs, on behalf of themselves and other similarly situated students and parents, bring the following claims: (1) Failure to provide meaningful parental and student participation in violation of IDEA, 20 U.S.C. §§ 1400 et seq. on behalf of the Parent Class and Student Class (Count One); (2) Failure to conduct evaluations of students in their native language in violation of the IDEA, 20 U.S.C. §§ 1400 et seq. on behalf of the Parent Class and members of the Student Class who are LEP (Count Two); (3) A violation of the Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and 22 Pa. Code § 15 on behalf of the Student Class (Count Three); (4) A violation of the Equal Education Opportunities Act ("EEOA"), 20 U.S.C. § 1703(f) on behalf of the Student Class (Count 4); (5) A violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d on behalf of the Parent Class and members of the Student Class who are LEP (Count 5); (6) A violation of 22 Pa. Code § 14 on behalf of the Parent Class and Student Class (Count Six); and (7) Failure to

provide regular education forms in violation of 22 Pa. Code § 15 on behalf of the Parent Class and Student Class (Count Seven).[4]

Plaintiffs seek to represent two classes composed of:

A. All parents as defined by 34 C.F.R. § 300.30(a) with limited English proficiency and whose children now or in the future are enrolled in the School District of Philadelphia and identified or eligible to be identified as children with a disability within the meaning of the IDEA and/or Section 504 and related state laws ("Parent Class"); and

B. All students who now or in the future are enrolled in the School District of Philadelphia in grades kindergarten through the age of legal entitlement who are identified or eligible to be identified as children with a disability within the meaning of the IDEA and/or Section 504 and related state laws, whether or not they are classified as English language learners and whose parents as defined by 34 C.F.R. § 300.30(a) are persons with limited English proficiency ("Student Class").

(Compl. ¶ 41.)

### D.  Statement of Interest

The United States, through the Department of Justice, has submitted a statement of interest.[5] Therein, the United States explains that it seeks to ensure that the national origin protections of Title VI and the EEOA are applied properly. The arguments offered by the United States are considered below in the sections addressing Plaintiffs' claims brought under those statutes.

---

[4] The Complaint refers to the following documents as "regular education forms:" report cards, homebound forms, pre-English Language class placement letters, and progress reports. (Compl. ¶ 6.)

[5] The statement of interest was filed pursuant to 28 U.S.C. § 517 which provides: "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States" and 20 U.S.C. § 1709 which provides that the Attorney General may intervene in an action filed by an individual to enforce the EEOA.

## II.   **LEGAL STANDARDS**

Federal Rule of Civil Procedure 12(b)(1) permits a party to bring a motion to dismiss for lack of subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). The burden of establishing federal jurisdiction rests with the party asserting its existence. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 n.3 (2006). A district court has to first determine "whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." Constitution Party of Pennsylvania v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014).

A facial attack, as the adjective indicates, is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court. Id. at 358. When evaluating a facial attack, like the one before me, courts apply the same standard of review used when "considering a motion to dismiss under Rule 12(b)(6), i.e., construing the alleged facts in favor of the nonmoving party." Aichele, 757 F.3d at 358.

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should

assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." <u>Burch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

III.   **DISCUSSION**

    **A.   IDEA**

The School District has moved to dismiss Plaintiffs' IDEA claims on the grounds that the Court lacks subject matter jurisdiction over the putative class members because they failed to exhaust their administrative remedies. Alternatively, the School District argues that, even if the Court has jurisdiction, Plaintiffs have failed to allege facts that give rise to a plausible claim for systemic relief.

    **1. Subject Matter Jurisdiction/Exhaustion of Administrative Remedies**

Under the IDEA, "any aggrieved party who received an adverse administrative determination regarding his or her complaints with respect to IDEA compliance may bring an action in a '[s]tate court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy,' 20 U.S.C. § 1415(i)(2)(A), within 90 days of the final administrative decision, 20 U.S.C. § 1415(i)(2)(B)." <u>Blunt v. Lower Merion Sch. Dist.</u>, 767 F.3d 247, 270 (3d Cir. 2014). The IDEA "thus grants subject matter jurisdiction to the district courts. However, it is clear from the language of the Act that Congress intended plaintiffs to complete the administrative process before resorting to federal court." <u>Komninos by Komninos v. Upper Saddle River Bd. of Educ.</u>, 13 F.3d 775, 778 (3d Cir. 1994).

A plaintiff, however, can bypass the IDEA's administrative process (1) "where exhaustion would be futile or inadequate;" (2) "where the issue presented is purely a legal question;" (3) "where the administrative agency cannot grant relief;" or (4) "when exhaustion would work severe or irreparable harm upon a litigant." <u>Beth V. by Yvonne V. v. Carroll</u>, 87

F.3d 80, 88 (3d Cir. 1996) (internal citations omitted). As such, plaintiffs may "be excused from the pursuit of administrative remedies where they allege systemic legal deficiencies and, correspondingly, request system-wide relief that cannot be provided (or even addressed) through the administrative process." Id. at 89.

The School District argues that I do not have subject matter jurisdiction over the putative class members because they have failed to exhaust their administrative remedies as required by the IDEA. The School District urges that the putative class members should not be excused from the pursuit of administrative remedies because the Complaint does not adequately allege a systemic legal deficiency.

The School District contends that Plaintiffs have failed to allege that the District adhered to a policy or system-wide practice that violates the IDEA. According to the School District, the vast majority of allegations concern the two named student Plaintiffs and the remaining allegations are conclusory. The School District urges that, rather than identifying "any affirmative policy adopted by the School District, the Plaintiffs instead complain of the School District's refusal to adopt policies advocated by Plaintiffs." (Def.'s Br. p.16.)[6]

---

[6] The School District urges that the systemic deficiency theory on which Plaintiffs rely is analogous to a theory rejected in Mrs. M v. Bridgeport Bd. of Educ., 96 F. Supp. 2d 124, 133 (D. Conn. 2000). Although not binding on this Court, I will briefly address this case as it forms a large portion of the School District's argument that Plaintiffs have failed to adequately allege a systemic deficiency.

In Mrs. M, the plaintiffs alleged that the school system had engaged in a "pattern and practice of illegally over-identifying minority school children as mentally retarded." Id. at 130–31. The court declined to excuse the putative class members from exhausting their administrative remedies because these claims required an evaluation of each individual child and, therefore, administrative proceedings were necessary to develop the factual record on those issues. Id. at 133-34. In reaching this conclusion, the court distinguished the plaintiffs' over-identification claims from those at issue in Mrs. W. v. Tirozzi, 832 F.2d 748 (2d Cir. 1987). Mrs. M, 96 F. Supp. at 133-34. In Mrs. W., the plaintiffs claimed that the school system had failed to provide adequate psychological staff or conduct mandatory periodic evaluations of students. Id. at 752. The court in Mrs. W excused the putative class members from the exhaustion requirement on the

In response, Plaintiffs point to the following paragraphs of the Complaint, which they assert adequately allege a systemic violation:

> Plaintiffs T.R. and A.G. and their guardians seek common injunctive relief to have the District adopt and implement a new written special education plan and policy to (1) provide legally mandated translation and interpretation services to members of the Parent Class and the Student Class, including the timely and complete translation of IEP process documents; and (2) require evaluations to be conducted in a child's native language unless it is clearly not feasible to do so.

> Despite these numbers and its knowledge of the problem, the District has adopted a policy in which it does not timely and completely translate IEPs, NOREPs, evaluations, re-evaluations, progress reports, assessments, and other IEP process documents outlining students' procedural and educational rights into the native languages spoken and/or read by LEP students and their parents.

> The District has been and continues to be aware that LEP parents and LEP students need timely and complete translations of regular education forms that pertain to their children's educational placement and needs, such as home instruction forms, ESOL placement letters, and progress reports. Instead, the District has adopted a policy and procedures which are ineffective to provide adequate support and which it knows does not fulfill its obligations or fails to meet the needs of Parent Plaintiffs, members of the Parent Class, Student Plaintiffs, and members of the Student Class who are LEP.

(Compl. ¶¶ 45, 55, 99.)

After review of the Complaint, I conclude that it sufficiently alleges a systemic legal deficiency – namely, the insufficient and untimely provision of interpretation and translation services. The Complaint contains supporting allegations regarding the supposedly objectionable practices the School District engages in pursuant to this policy. Plaintiffs' systemic legal deficiency theory does not amount to a challenge to the individual determinations the School

---

grounds that they had alleged a practice of systemic violations and, as such, the administrative process could not provide the system-wide relief they sought. Id. at 757.

Viewed in the light most favorable to Plaintiffs, the allegations in the Complaint before me are more akin to Mrs. W than Mrs. M. Here, Plaintiffs challenge a policy of general applicability, which they have at least plausibly alleged is incapable of being remedied through the available administrative process.

District reached concerning the two named student Plaintiffs. Rather, as alleged, Plaintiffs have identified a systemic practice by the School District that interferes with the ability of LEP students with disabilities to receive a FAPE and/or the ability of LEP parents to meaningfully participate in the planning and decision-making embodied in the IEP process.

Additionally, even if the School District is correct that pleading a policy is necessary, Plaintiffs have adequately alleged that the School District adhered to a system-wide policy of inaction. Contrary to the School District's position, as a general principle, a policy of inaction is nonetheless a policy. See, e.g., City of Canton, Ohio v. Harris, 489 U.S. 378, 395 (1989) (a "'policy of inaction' is the functional equivalent of a decision by the city itself").

It is certainly possible that a developed record may not establish Plaintiffs' systemic legal deficiency theory. However, at this stage, the Complaint's allegations must be accepted as true and, viewed in this light, there are adequate allegations of a systemic violation of the IDEA. As such, the members of the Parent and Student Class will be excused from exhausting their administrative remedies.[7] Therefore, the School District's motion to dismiss the putative class members' IDEA claim for lack of subject matter jurisdiction will be denied.

### 2. Failure to State a Claim for Systemic Relief

Next, the School District argues that, even if sufficiently alleged, Plaintiffs' systemic deficiency theory and corresponding requested relief are contrary to the IDEA and its regulatory

---

[7] As noted below, the corresponding system wide relief is also adequately alleged. Along those lines, the Hearing Officer who conducted A.G.'s administrative proceedings concluded that he had no authority to find that the School District's alleged "policy or practice results in violations per se, or results in violations for all similarly situated students or parents." (Pls.' Resp. p. 5.) The Hearing Officer's finding provides additional support for my conclusion that the administrative process is an inadequate mechanism for resolving the supposedly systemic deficiencies Plaintiffs have identified. See Komninos, 13 F.3d at 778 (exhaustion may be excused "where the administrative agency cannot grant relief.")

framework.[8] According to the School District, Plaintiffs' request for mandatory translation of each and every IEP process document is inconsistent with the IDEA and, therefore, improper.

In support, the School District points to guidelines promulgated by the Department of Justice which instruct that the "question of whether to provide written translations of documents should be determined on a case by case basis." (Def.'s Br. p.17 (citing DOJ Guidance, Fed. Reg. Vol. 67, No. 117 at 41463.)) [9] The School District stresses that the Guidelines provide that the funding recipient should "determine the extent of its obligation to provide LEP services" through "individualized assessment that balances the following four factors: (1) The number or proportion of LEP persons eligible to be served or likely to be encountered by the program or grantee; (2) the frequency with which LEP individuals come in contact with the program; (3) the nature and importance of the program, activity, or service provided by the program to people's lives; and (4) the resources available to the grantee/recipient and costs." Id. at 41455-01(V). In light of these factors, the School District urges that Plaintiffs' "rigid" proposed policy of mandatory translation contravenes the case-by-case approach mandated by the DOJ Guidelines.

In response, Plaintiffs point to provisions of the IDEA which require the School District to systematically provide certain documents, such as the IEP and notice of changes thereto, in writing. See 20 U.S.C. § 1415(d)(1)(A)(i); 34 C.F.R. 300.320, 300.323 (IEP); 20 U.S.C. § 1415(b)(3), (c) (prior written notice of decision to initiate or change a program or refusal to do

---

[8] The School District offered several additional arguments in support of their motion to dismiss Plaintiffs' IDEA claim. (See, e.g., Def.'s Mot. p. 19-21) (urging dismissal on the grounds that the requested relief would impose an excessive burden on the School District). Those arguments, however, raise factual questions which are not appropriately resolved at this stage of the litigation.

[9] In their initial motion, the School District urged that the DOJ Guidelines should be afforded deference. (Def.'s Mot. p. 17 n.6.) However, in its reply, the School District reversed course and urged that the guidelines are not entitled to any deference when interpreting the IDEA. (Def.'s Reply p. 10.)

so must be in writing). Plaintiffs emphasize that the notice required by § 1415(b)(3) must be provided in the "native language of the parents, unless it clearly is not feasible to do so." 20 U.S.C. § 1415(b)(4).

According to Plaintiffs, the only discretionary component recognized by the IDEA is whether translation is feasible (i.e. whether the parent's language is not a written language). Alternatively, Plaintiffs argue that even if the School District were correct that it has some discretion in deciding which IEP documents should be translated on a case-by-case basis, the Complaint alleges that the School District is not exercising any discretion in light of the fact that it has not fully translated an IEP for a single LEP parent.

For several reasons, I conclude that the School District's reliance on the DOJ Guidelines and argument that the systemic deficiencies alleged are contrary to the IDEA is unavailing. First, the guidelines upon which the School District relies interpret Title VI, not the IDEA and it is the Department of Education, not the DOJ that is tasked with promulgating regulations to implement the IDEA. See § 20 U.S.C. § 1406. As such, the DOJ Guidelines are not entitled to deference in the IDEA context.

Second, even if the School District is correct that the decision as to which documents to translate must be made on a case-by-case basis, nothing in the Complaint suggests that the School District is making such an individualized determination. In fact, viewed in the light most favorable to Plaintiffs, the Complaint plausibly alleges that the School District has failed to exercise any discretion in this fashion and instead has adhered to a blanket policy of inaction.

Lastly, the IDEA does include a general mandate that certain documents be provided to LEP parents in writing and in their native language, and also that evaluations be conducted in the student's native language. See, e.g., 20 U.S.C. § 1415(b)(3)-(4), 34 C.F.R. § 300.324(a)(2)(ii).

13

The Complaint adequately alleges that the School District has adopted a policy in contravention of these statutory and regulatory requirements. At this stage, I conclude that systemic failures and corresponding relief are sufficiently alleged. As such, the School District's motion to dismiss Plaintiffs' IDEA claim for failure to state a claim will be denied.

### B.  Rehabilitation Act, the ADA and 22 Pa. Code § 15

The School District also argues that the claims raised under the Rehabilitation Act, the ADA and 22 Pa. Code § 15 should be dismissed because the Complaint does not allege that the School District discriminated against the Student Plaintiffs on the basis of disability.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[10]

In relevant part, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To state a claim under either the ADA or Section 504 of the RA, plaintiffs must allege that: "(1) they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service or benefit because of their disability." CG v. Pennsylvania Dep't

---

[10] Chapter 15 of the Pennsylvania Code "implements the statutory and regulatory requirements of Section 504." 22 Pa. Code § 15.1. As Chapter 15 does not preempt or expand the rights and liabilities under Section 504 of the RA, courts treat Chapter 15 as coextensive with Section 504 of the RA. See, e.g., A.W. ex rel. H.W. v. Middletown Area Sch. Dist., 2015 WL 390864, at *15 (M.D. Pa. Jan. 28, 2015); K.K. ex rel. L.K. v. Pittsburgh Pub. Sch., 2014 WL 4670038, at *4 n. 3 (3d Cir. Sept. 22, 2014).

of Educ., 734 F.3d 229, 235 (3d Cir. 2013).[11] However, the causation elements of the respective statutes differ. Id. (citing 42 U.S.C. § 12132 ("by reason of such disability"); 29 U.S.C. § 794(a) ("solely by reason of her or his disability")). "The RA allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a program solely on the basis of disability, while the ADA covers discrimination on the basis of disability, even if there is another cause as well. To satisfy either causation requirement, Plaintiffs must prove that they were treated differently based on the protected characteristic, namely the existence of their disability." Id. at 235-236; CG, 734 F.3d at 235–36 ("The RA allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a program solely on the basis of disability, while the ADA covers discrimination on the basis of disability, even if there is another cause as well.")

The School District urges that the Complaint is devoid of allegations that the School District discriminated against the Student Plaintiffs on the basis of disability. As such, the School District argues that both the Section 504 and ADA claims must be dismissed.

Plaintiffs respond that the Complaint adequately alleges that the School District's failure to provide adequate translation and interpretation services deprives the Student Plaintiffs of educational services necessary for them to receive a FAPE. Plaintiffs argue that precedent from the United States Court of Appeals for the Third Circuit supports the proposition that the failure to provide students with disabilities a FAPE generally violates the ADA and Section 504 as well as the IDEA.

I conclude that, at this stage, the allegations that the School District failed to provide the Student Plaintiffs with a FAPE are sufficient to support their ADA and Section 504 claims. The

---

[11] The Third Circuit has "explained that 'the substantive standards for determining liability under the Rehabilitation Act and the ADA are the same.'" Blunt, 767 F.3d at 275 (quoting Ridley Sch. Dist. v. M.R., 680 F.3d 260, 282–83 (3d Cir. 2012)).

Third Circuit has held that the "[f]ailure to provide a FAPE violates Part B of the IDEA and generally violates the ADA and RA because it deprives disabled students of a benefit that non-disabled students receive simply by attending school in the normal course—a free, appropriate public education." CG, 734 F.3d at 235. As such, courts have found allegations that a student has been denied a FAPE sufficient to allege a claim under the RA. See, e.g., Centennial Sch. Dist. v. Phil L. ex rel. Matthew L., 799 F. Supp. 2d 473, 489 (E.D. Pa. 2011). On the other hand, a finding that a student received a FAPE under the IDEA "is equally dispositive" of a plaintiff's § 504 claim. D.K. v. Abington Sch. Dist., 696 F.3d 233, 253 n. 8 (3d Cir. 2012); Jalen Z. v. Sch. Dist. of Philadelphia, 104 F. Supp. 3d 660, 683 (E.D. Pa. 2015).

The School District also asserts that the Student Plaintiffs' Section 504 claim fails because the Complaint does not allege that disability was the "sole cause of the alleged discrimination." (Def.'s Mot. p. 22.) According to the School District, the Complaint alleges that the supposed discrimination was based on limited English proficiency not disability.

However, as discussed above, the denial of a FAPE generally violates Section 504 "because it deprives disabled students of a benefit that non-disabled students receive simply by attending school in the normal course—a free, appropriate public education." CG, 734 F.3d at 235. Other courts within this circuit have rejected the argument that a Plaintiff asserting a violation of section 504 must establish more than a denial of a FAPE. See Centennial Sch. Dist. v. Phil L. ex rel. Matthew L., 799 F. Supp. 2d 473, 488, 489 n.10 (E.D. Pa. 2011) (rejecting the argument that, to prevail under Section 504, a plaintiff must prove not only a denial of a FAPE but also that the denial was "solely on the basis of disability"); Neena S. ex rel. Robert S. v. Sch. Dist. of Philadelphia, 2008 WL 5273546, at *14 (E.D. Pa. Dec. 19, 2008). I agree with these

holdings and decline to impose an additional pleading burden on the Student Plaintiffs which is unsupported by Third Circuit precedent.

### C. Equal Education Opportunity Act and Title VI

The School District also seeks dismissal of Plaintiffs' claims made under the Equal Education Opportunity Act ("EEOA") and Title VI.

In relevant part, the EEOA provides that "[n]o State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by. . . the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

To state a plausible claim under the EEOA, "Plaintiffs must establish: (1) language barriers; (2) defendant's failure to take appropriate action to overcome these barriers; and (3) a resulting impediment to students' equal participation in instructional program." <u>CG v. Pa. Dep't of Educ.</u>, 888 F. Supp. 2d 534, 575 (M.D. Pa. 2012) (internal quotation marks omitted).

Under Title VI of the Civil Rights Act, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

The School District urges that Plaintiffs have failed to state a claim under the EEOA and Title VI because the Complaint does not adequately allege discrimination based on Plaintiffs' national origin.[12] According to the School District, discrimination based on limited English proficiency is not the same as discrimination based on national origin and there is no basis in the Complaint on which to infer the School District's allegedly unlawful conduct was linked to

---

[12] The School District offers nearly identical arguments in support of its motions to dismiss Plaintiffs' EEOA and Title VI claims. As such, I have considered the arguments together.

Plaintiffs' national origin. In support, the School District cites to <u>Mumid v. Abraham Lincoln High School</u>, 618 F.3d 789 (8th Cir. 2010) and <u>K.A.B. ex rel. Susan B. v. Downington Area School District.</u>, 2013 WL 3742413 (E.D. Pa. July 16, 2013).[13]

In <u>Mumid</u>, the United States Court of Appeals for the Eighth Circuit held that "[w]hile Title VI prohibits discrimination on the basis of national origin, language and national origin are not interchangeable. . . . A policy that treats students with limited English proficiency differently than other students in the district does not facially discriminate based on national origin." 618 F.3d at 795. Relying on <u>Mumid</u>, the court in <u>K.A.B.</u> held that a challenge to a practice of delayed testing of a special-needs student with LEP was not cognizable under the EEOA because "discrimination based on English proficiency is not the same as discrimination based on national origin." <u>K.A.B.</u>, 2013 WL 3742413, at *12.

Plaintiffs respond that the School District ignores the "well-recognized interrelationship between limited English proficiency and national origin." (Pls.' Resp. p. 21.) As an example in the EEOA context, Plaintiffs cite to <u>CG v. Pennsylvania Department of Education</u>, 547 F. Supp. 2d 422 (M.D. Pa. 2008) where the court denied a motion to dismiss an EEOA claim reasoning that it was sufficient for plaintiffs to allege that they had been "injured by being impeded in their equal participation in educational opportunities by defendant's failure to take appropriate action to overcome language barriers." <u>Id.</u> at 435.

Regarding Title VI in particular, Plaintiffs point to <u>Lau v. Nichols</u>, 414 U.S. 563 (1974) where the United States Supreme Court held that the school district's failure to provide adequate language services to LEP students of Chinese ancestry violated Title VI's prohibition against discrimination based on national origin. <u>Id.</u> at 658. In reaching this conclusion, the Supreme

---

[13] I note that the portion of <u>Mumid</u> upon which the School District relies analyzes Title VI not the EEOA.

Court reasoned that the school district's failure caused "students who do not understand English" to be "effectively foreclosed from any meaningful education." Id. at 566.

In their statement of interest, the United States notes that, consistent with Lau, numerous federal courts have found that language based discrimination constitutes a form of national origin discrimination prohibited by Title VI. See, e.g., United States v. Maricopa Cty., Ariz., 915 F. Supp. 2d 1073, 1079 (D. Ariz. 2012) ("longstanding case law, federal regulations and agency interpretation of those regulations hold language-based discrimination constitutes a form of national origin discrimination under Title VI"); Serna v. Portales Mun. Sch., 499 F.2d 1147, 1153 (10th Cir. 1974); Jones v. Gusman, 296 F.R.D. 416, 454 (E.D. La. 2013).

The United States also points to federal regulations and guidance which require federal funding recipients to take reasonable steps to communicate with LEP persons in languages other than English to ensure meaningful access under Title VI. (See Statement of Interest pp. 8-10.) The United States asserts and the School District concedes that the DOJ's guidance on a recipient's obligations to LEP individuals are entitled to deference in the Title VI context.

I conclude that the Supreme Court's pronouncement in Lau instructs that language based discrimination can constitute an actionable form of national origin discrimination. The numerous cases cited by the United States and the DOJ's guidance, read in conjunction with Lau, foreclose dismissal of Plaintiffs' EEOA and Title VI claims.

Neither Mumid nor K.A.B. mention, let alone distinguish, the Supreme Court's holding in Lau. See United States v. Maricopa County, 915 F. Supp. 2d 1073, 1081 (D. Ariz. 2012) (rejecting defendants' argument that Mumid supports "their argument that national origin does not cover LEP individuals under Title VI" in part because Mumid fails to address or distinguish Lau). Indeed, when asked about the apparent inconsistency between Lau and Mumid and K.A.B.

at oral argument, the School District responded that <u>Lau</u> presented a unique factual situation in which the discriminatory conduct was directed towards a group of students with a single shared ancestry. Nothing in the Supreme Court's reasoning in <u>Lau</u> supports the School District's narrow reading.

For these reasons, I conclude that the School District's reliance on <u>Mumid</u> and <u>K.A.B.</u> is unpersuasive. At this stage, Plaintiffs' allegations are sufficient to state a claim under the EEOA and Title VI. Therefore, the School District's motion to dismiss Plaintiffs' EEOA and Title VI claims will be denied.

**IV.** <u>**CONCLUSION**</u>

For the foregoing reasons, the School District's motion to dismiss will be denied. An appropriate Order follows.