# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| T.R., et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | No. 15-4782 |
| | : | |
| SCHOOL DISTRICT OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**Goldberg, J.**                                                  **April 18, 2019**

## MEMORANDUM OPINION

Plaintiffs—students and parents in the School District of Philadelphia—have filed this putative class action lawsuit under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act, Americans with Disabilities Act, 22 Pa. Code §§ 14–15, the Equal Education Opportunities Act, and Title VI of the Civil Rights Act of 1964. Plaintiffs allege that the School District of Philadelphia's ("School District") provision of translation and interpretation services to limited English proficient parents deprives parents and their children of the ability to meaningfully participate in the special education process and the development of individualized education programs ("IEP").

Presently before me is Plaintiffs' Motion for Class Certification. For the following reasons, I will deny the Plaintiffs' Motion in its entirety.

# I. FACTUAL AND PROCEDURAL HISTORY

## A.  General Allegations Regarding School District Practices and Policies

The IDEA, 20 U.S.C. § 1400, et seq., requires that, in order to accommodate the educational needs of children with disabilities, there must be a process of written notice, parent consent, evaluation, creation and review of documents, and development of an IEP in conjunction with school staff and parents, all of which is known as the "IEP process."  The central question in this matter turns on the  implementation of this IEP process to children with disabilities from homes with limited English proficient ("LEP") parents.

According to the Amended Complaint,[1] as of November 2013, the School District reported that there were approximately 25,900 families whose primary home language was not English and some 19,670 families of students in the District who had expressly requested documents in a language other than English.  As of November 2013, the District also reported that there were more than 1,500 English Language Learner ("ELL") or LEP students receiving special education services across the District, and 1,887 students with IEPs whose records indicated that their home language was not English.  Yet, Plaintiffs allege that only 487 special education documents of any type had been orally interpreted during the 2012–13 school year.  (Am. Compl. ¶¶ 61–62.)

The School District's oral interpretation services are provided primarily by Bilingual Counseling Assistants ("BCAs").  According to Plaintiffs, only fifty-four to fifty-five of those BCAs were employed by the School District during the 2012–13 school year.  BCAs provide limited interpretation services, but no translation services.  While the School District has a Translation and Interpretation Center which routinely translates documents used for students

---

[1]  Although a court may go beyond the complaint to determine whether a class should be certified, In re Hydrogen Peroxide Litig., 552 F.3d 305, 318 (3d Cir. 2008), a plaintiff has no obligation to establish the merits of the case at the certification stage, and the substantive allegations of the complaint should be taken as true.  Dittimus-Bey v. Taylor, 244 F.R.D. 284, 290 (D.N.J. 2007).

without disabilities, Plaintiffs allege that this office has never completely translated an IEP in its entirety, and parents cannot unilaterally request translation services.  (Id. ¶¶ 61–64.)

According to Plaintiffs, the School District has adopted a policy in which it does not timely and completely translate IEPs, Notices of Recommended Educational Placement ("NOREPs"), evaluations, re-evaluations, progress reports, assessments, and other IEP process documents outlining students' procedural and educational rights into the native languages spoken and/or read by LEP students and their parents.  Further, and allegedly in violation of the state special education law, the School District does not provide completely translated evaluations and re-evaluations to parents at least ten school days prior to IEP team meetings.  Although the School District attempts to provide some oral interpretation during IEP team meetings, Plaintiffs assert that the "incomplete, inconsistent effort" does not facilitate the meaningful parent participation required by federal law and does not comport with state law requirements.  According to Plaintiffs, the School District deliberately chose not to utilize TransAct, which is a translation program provided by the Commonwealth of Pennsylvania to school districts to enable them to translate documents. (Id. ¶¶ 65–67, 71.)

The essence of Plaintiffs' Amended Complaint is that absent the receipt of the required information translated into their preferred language, LEP parents are unable to either make informed decisions regarding program and placement or to provide legally viable consent for their children's placements and IEPs.  According to Plaintiffs, the parents and students have been deprived of the opportunity to participate fully and equally in the IEP process, which, in turn, has impaired the ability of the students to receive a free, appropriate, public education.  (Id. ¶¶ 68–69.)

**B.    The Individual Class Representatives**[2]

The Amended Complaint alleges the following regarding the individual class representatives:

1.    L.R., D.R., J.R., and Madeline Perez

Named Plaintiffs L.R., D.R., and J.R. attended school in Puerto Rico until they moved to Philadelphia in 2012. They all received special education services and had IEPs in Puerto Rico when they enrolled in the Philadelphia School District. (Id. ¶ 87.)

L.R. has attention deficit hyperactivity disorder ("ADHD"), having been originally evaluated and diagnosed with autism in 2012 by the Center for Autism. The evaluation and diagnosis was provided in Spanish to L.R.'s mother, Madeline Perez. The School District then undertook to create a separate Evaluation Report for L.R. in 2012, but did not translate that Report into Spanish for Ms. Perez. (Id. ¶ 88.)

Between 2012 and 2016, L.R. was enrolled in two elementary schools and one middle school in the School District before he was given a private school placement. The School District purportedly refused to translate all of L.R.'s IEP process documents into Spanish for Ms. Perez, despite her requests that it do so. Because Ms. Perez is LEP, she claims that she has not been able to understand what services the School District has provided to L.R., and has not been able to meaningfully participate in the IEP process. As a result, when the School District omitted L.R.'s 2012 autism diagnosis from his IEPs, Ms. Perez remained unaware of this omission until 2016. (Id. ¶¶ 89–90.)

_____

[2] The Amended Complaint sets forth allegations about four class representatives. Two of those representatives have been voluntarily dismissed. As such, I discuss only the allegations regarding the two remaining representatives.

Ms. Perez's other children, D.R. and J.R., also attended two elementary schools in the School District and are now enrolled in two different District high schools. Both have been diagnosed with oppositional defiance disorder ("ODD") and ADHD. Although Ms. Perez attended IEP meetings for these children, the School District did not translate their IEP process documents into Spanish, despite her requests. At the most recent IEP meeting for J.R., in January 2017, Ms. Perez again requested a fully translated IEP, but the School District told her it could only provide translated caption headings. At the most recent IEP meeting for D.R., on March 6, 2017, Ms. Perez believed the School District agreed to provide a translated copy of the IEP by March 15, 2017, but she still has not received such a copy. Absent translations of the IEP process documents, Ms. Perez has been unable to participate meaningfully in the IEP planning process for D.R. and J.R. The School District also provided insufficient oral interpretation services to Ms. Perez during IEP team meetings, and at some meetings, there was no interpreter provided. (Id. ¶¶ 91–96.)

### 2. R.H. and Manqing Lin

At the time relevant to the class action Complaint, R.H. was a kindergarten student at an elementary school in the School District. In 2014, R.H. underwent several evaluations and was ultimately diagnosed with Autism Spectrum Disorder. As an infant and toddler, R.H. received early intervention services, including, speech, special instruction, and occupational therapy, and R.H. independently received physical therapy. In a 2015 evaluation, R.H. was found to be mentally gifted according to the Kaufman Assessment Battery for Children, with a score placing R.H. in the 99.9% superior range for aptitude in math and at the age equivalent of nine-year old. (Id. ¶¶ 97–99.)

R.H.'s mother, Manqing Lin, can understand and speak some English words, but has limited English proficiency and speaks only Mandarin. Beginning with R.H.'s transition to

kindergarten, the School District has allegedly failed to translate forms, evaluations, and IEP documents into Mandarin, or to provide Ms. Lin with sufficient oral interpretation services. At the first meeting in February 2016, the District gave Ms. Lin forms, including a "Permission to Evaluate" ("PTE") form, in English only, and provided no translation or oral interpretation services. Ms. Lin had to rely on a friend and interpreter provided by R.H.'s early intervention provider, but even that was insufficient to assist her in answering and consenting to the PTE form. She later signed the form without a full understanding of what she was signing. Furthermore, due to the lack of translation and interpretation services, Ms. Lin had to request assistance from R.H.'s preschool teacher in completing the required forms, and later learned that the teacher had omitted information needed to develop appropriate programming for R.H. (Id. ¶¶ 100–02.)

After the School District conducted its evaluation of R.H., it sent Ms. Lin an evaluation report in English, and later in Mandarin, concluding that R.H. qualified for speech services. The report failed to mention R.H.'s needs for occupational therapy, physical therapy, a functional behavior assessment, a behavior plan, or gifted programming in math. As a result of a mediation regarding this evaluation, and the demonstrated need for an independent education evaluation ("IEE"), the School District agreed to provide translated copies of the IEE and other documents. The School District, however, has refused to provide translations of anything other than the "final" re-evaluation report and "final" IEP, while refusing to provided translated versions of its proposed re-evaluation and IEP to Ms. Lin. (Id. ¶¶ 103–04.)

On March 3, 2017, the School District provided a proposed IEP to be discussed at R.H.'s next IEP meeting, but translated only the section titles and a few sentences regarding R.H.'s placement. When Ms. Lin requested that the proposed IEP be fully translated, the School District claimed that it only agreed to translate the "final" IEP. (Id. ¶ 105.)

## C.     Procedural History

Plaintiffs initiated this action on August 21, 2015, and filed an Amended Complaint on April 10, 2017.  Count One alleges a violation of the Individuals with Disabilities Education Act ("IDEA") for failure to provide meaningful parental and student participation.  Count Two sets forth a violation a of IDEA for failure to conduct evaluations of students in their native language.  Count Three asserts a violation of Section 504 of the Rehabilitation Act, Americans With Disabilities Act as amended, and 22 Pa. Code Chapter 15.  Count Four pleads a claim for violation of the Equal Education Opportunity Act.  Count Five alleges a claim for violation of Title VI of the Civil Rights Act of 1964.  Count Six sets forth a violation of 22 Pa. Code Chap. 14.  Finally, Count Seven sets forth a violation of 22 Pa. Code Chap. 15.

The Amended Complaint seeks to bring these causes of action on behalf of two proposed classes:

> A.     All parents as defined by 34 C.F.R. § 300.30(a) with limited English proficiency <u>and</u> whose children now or in the future are enrolled in the School District of Philadelphia and identified or eligible to be identified as children with a disability within the meaning of the IDEA and/or Section 504 and related state laws ("Parent Class"); and

> B.     All students who now or in the future are enrolled in the School District of Philadelphia in grades kindergarten through the age of legal entitlement who are identified or eligible to be identified as children with a disability within the meaning of the IDEA and/or Section 504 and related state laws, whether or not they are classified as English language learners <u>and</u> whose parents as defined by 34 C.F.R. § 300.30(a) are persons with limited English proficiency ("Student Class").

(Am. Compl. ¶ 51.)

On August 3, 2018, Plaintiffs filed a Motion for Class Certification, which is opposed by the School District.

## II. MOTION FOR LEAVE TO SUPPLEMENT THE RECORD

Prior to reaching the merits of the Motion for Class Certification, I will first consider Plaintiffs' Motion for Leave to Supplement the Record.

Well after class certification briefing was completed in this matter, Plaintiffs sought leave to supplement the record with a report, issued on October 31, 2018, by the Pennsylvania Department of Education (the "Report"). The Report was prepared in response to a complaint regarding the School District's "issues concerning the transition process for special education students transitioning from early intervention (EI) to school-aged programs dated August 9, 2017 and amended on November 14, 2017." (Pls.' Mot. to Supplement, Ex. A.) The Report made the following findings:

- only 43% of evaluations of students whose native language is other than English "were conducted by bi-lingual psychologists."

- "[o]nly one of the 25 files reviewed, or four percent of the files indicated that the evaluation was conducted in the student's native language."

- "[o]nly one of the 25 files reviewed indicated that a [bilingual counseling assistant] was part of the evaluation team."

- "[o]nly two of the files reviewed or eight percent of the files, indicated that the required forms of notice including [Permissions to Reevaluate], and Notice of Recommended Educational Placement/Prior Written Notice (NOREP) were provided to the parents in their native language."

(Id.) The Report concluded that the School District failed in its obligation to ensure that evaluations are provided and administered in the child's native language, and that the School District has "failed to implement its own procedures with regards to evaluating English Language Learner (ELL) students." Id. Accordingly, the Pennsylvania Department of Education ordered the District to take various corrective measures.

Plaintiffs now seek to supplement the record with this Report, contending that it supports the analysis of the Rule 23(a) factors required for class certification. Plaintiffs urge that the findings of the Bureau of Special Education mirror certain questions of fact and law identified by Plaintiffs in addressing the commonality element. Plaintiffs point out that because the Bureau conducted a file review from at least twenty-five students whose native language is not English, the Report assists in proving that numerosity is satisfied. Plaintiffs also contend that the Report shows that the named Plaintiffs' claims are typical of those of the putative class members.

The School District does not object to Plaintiffs' request to supplement the record, but argues that the Report should not be substantively considered on class certification for two reasons: (1) it is inadmissible hearsay; and (2) it is irrelevant to the issues raised in the Motion for Class Certification.

With respect to the hearsay objection, the School District contends that the Report is an out-of-court statement by the Pennsylvania Department of Education that Plaintiffs are attempting use for the truth of the matter asserted therein, *i.e.*, that the requirements of Federal Rule of Civil Procedure 23(a) are met.

Under Federal Rule of Civil Procedure 803(8)(A)(ii), "a public record, even if hearsay, is admissible if it sets forth factual findings from a legally authorized investigation and is trustworthy." Boyle v. Progressive Specialty Ins. Co., 326 F.R.D. 69, 96 (E.D. Pa. 2018) (citing Fed. R. Evid. 803(8)(A)(iii),(B)). "Justification for the exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Fed. R. Evid. 803, note to Paragraph (8). As the School District has not shown any circumstances that would call the trustworthiness of the Report into question, I find that it is not barred by the hearsay rule.

With respect to relevance, however, the School District raises a valid objection  The common questions identified by the Plaintiffs in their Motion for Class Certification for both the Parent and the Student Classes concern generally whether the School District provides various forms of notice and IEP documents to LEP *parents* in their native language, and whether the School District provides adequate interpretation services to allow such parents to meaningfully participate in their children's education.  The Report, however, focuses primarily on whether the evaluation process of LEP *students* was performed in the native language of that student—an issue for which Plaintiffs have not sought class certification.  While some of the Report's findings may bear on the merits of Plaintiffs' claims, Plaintiffs have not clearly explained how the Report assists in an analysis of the Rule 23 factors required for class certification.

Nonetheless, for purposes of ensuring the most comprehensive review of the class certification issues, I will grant the Motion to Supplement the Record and explain the Report's lack of relevance as necessary with respect to each of the Rule 23 elements.[3]

## III.    STANDARD OF REVIEW FOR CLASS CERTIFICATION

To obtain certification, a class must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and 23(b).  Rule 23(a) sets forth four prerequisites to class certification:

> (1) the class is so numerous that joinder is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

---

[3]  In doing so, I also consider the Pennsylvania Department of Education's February 7, 2019 letter closing out the corrective action requirements from the file review in the October 31, 2018 report. This letter was submitted by the School District on February 20, 2019, in an unopposed Motion for Leave to Supplement the Record.

Following consideration of these four prerequisites—often referred to as numerosity, commonality, typicality, and adequacy of representation—the court must examine whether the class falls within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b). In re Cmty. Bank of N. Va., 418 F.3d 277, 302 (3d Cir. 2005). In this case, Plaintiffs move for class certification under Rule 23(b)(2), which provides for certification when:

> [T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]

Fed. R. Civ. P. 23(b)(2).

The proponent of certification bears the burden of proving both the prerequisites of a class action under Rule 23(a), and that the class fits within one of the Rule 23(b) categories. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 591 (3d Cir. 2012). Although the plaintiff need not establish the merits of his case at this stage, the Third Circuit has held that "[a]n overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316 (3d Cir. 2008). "It may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Id. (quotations omitted); see also Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006). In other words, "[i]n deciding whether to certify a class under [Rule] 23, the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties," including expert testimony. Hydrogen Peroxide, 552 F.3d at 307.

Ultimately, a court's class certification analysis must be "rigorous." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011). "[T]he decision to certify a class calls for findings by the

court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met," and that "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." Hydrogen Peroxide, 552 F.3d at 320. "In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." Id. "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." Id. at 318.

## IV.    LEGAL DISCUSSION OF CLASS CERTIFICATION

Plaintiffs allege that their proposed classes meet all of the Rule 23(a) requirements, as well as the requirements of Rule 23(b)(2). The School District sets forth several challenges to the class definition and argues that Plaintiffs have failed to meet their burden of establishing the Rule 23 requirements. To provide the requisite "rigorous" analysis mandated by the United States Supreme Court, Dukes, 564 U.S. at 351, I consider each of these arguments individually.

### A.    Challenges to the Class Definition

Prior to addressing the Rule 23 requirements, the School District raises two broad challenges to the class definition. First it contends that class certification is improper because Plaintiffs' mere allegation of a systemic failure does not establish a class. Second, the School District urges that Plaintiffs' class definition is ambiguous, unworkable, and does not allow the Court to readily determine who is a member of the class.

#### 1.    Allegations of a Systemic Failure

At the outset of its opposition brief, the School District posits that Plaintiffs are "operating under the mistaken notion that they can avoid the rigorous analysis for class certification by repeatedly referring to the District's alleged systemic failures to provide adequate foreign language services to parents during the special education process." (Defs.' Resp. 5.) The School District contends that the claims here are not systemic and involve only a limited component of the School

District's special education program. As such, it concludes that resolving each of the named Plaintiffs' claims will entail a "factually intensive inquiry." (Id. at 6.)

In support of its argument, the School District relies on the Third Circuit case of J.T. ex rel. A.T. v. Dumont Public Schools, 533 F. App'x 44 (3d Cir. 2013). In that case the named plaintiff alleged, on behalf of a putative class, that the school district failed to individually consider education placements of kindergarteners. Id. at 47. The dispute involved the school district's placement of plaintiff in an inclusion classroom. Id. Considering the matter in the context of a motion for summary judgment for failure to exhaust administrative remedies—not in the context of a motion for class certification—the Third Circuit found that "the procedure through which the school district placed [the named plaintiff student] in the inclusion class is not rendered a systemic issue simply because [plaintiff] raise[d] it in a putative class action." Id. at 54. The court noted that "even if plaintiffs had an unsatisfactory experience with the administrative process, . . . it would be mere speculation for us to conclude that the administrative process would fail" the other plaintiffs. Id. at 54 (internal quotation marks omitted).

Here, by contrast, the named Plaintiffs allege a failure by the School District to provide appropriate translation services throughout the special education process. Unlike the individualized issue involved in J.T., the request for District-wide relief is the subject of the rigorous Rule 23 analysis. The School District's denial that it engages in the alleged conduct on a systemic basis is not appropriate when considering class certification. See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U.S. 455, 465–66 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); see also

Sullivan v. DB Investments, Inc., 667 F.3d 273, 306 (3d Cir. 2011) ("[P]laintiffs need not actually establish the validity of claims at the certification stage.").

        2.   Ambiguity of the Class Definition

The School District next challenges Plaintiffs' proposed class definitions as ambiguous. It posits that membership in either of Plaintiffs' proposed classes hinges on a parent's status as "limited English proficient" or "LEP," without any definition of what "limited English proficient" means. According to the School District, the only statutory definition of this term, which is incorporated into the IDEA regulations, relates explicitly to LEP students and has no applicability to parents.[4] As such, the School District urges that the determination of whether a parent is LEP

---

[4] IDEA defines the term "limited English proficient" as having the meaning given the term "English learner" in section 8101 of the Elementary and Secondary Education Act of 1965 ("ESEA"). 20 U.S.C. § 1401(18). The ESEA defines "English learner" as an individual:

(A) who is aged 3 through 21;
(B) who is enrolled or preparing to enroll in an elementary school or secondary school;
(C) (i) who was not born in the United States or whose native language is a language other than English;
(ii) (I) who is a Native American or Alaska Native, or a native resident of the outlying areas; and
    (II) who comes from an environment where a language other than English has had a significant impact      on the individual's level of English language proficiency; or
(iii) who is migratory, whose native language is a language other than English, and who comes from an environment where a language other than English is dominant; and
(D) whose difficulties in speaking, reading, writing, or understanding the English language may be sufficient to deny the individual—
(i) the ability to meet the challenging State academic standards;
(ii) the ability to successfully achieve in classrooms where the language of instruction is English; or
(iii) the opportunity to participate fully in society.

20 U.S.C. § 7801(20).

would require a comprehensive factual record and a "mini-hearing" on the merits of each class member's case.

The School District's argument appears to rest on the mistaken notion that Plaintiffs' class must be ascertainable. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a 'reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015) (quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013)).

However, the ascertainability requirement applies only to Rule 23(b)(3) classes and "is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief." Shelton v. Bledsoe, 775 F.3d 554, 563 (3d Cir. 2015). Certification of a Rule 23(b)(2) class is appropriate where the "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) was written with the purpose of "remedy[ing] systemic violations of basic rights of large and often amorphous classes." Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 64 (3d Cir. 1994). The Third Circuit has expressly held that "it is improper to require ascertainability for a (b)(2) class" because "[t]he key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful *only* as to all of the class members or as to none of them.'" Shelton, 775 F.3d at 561, 562 (quoting Dukes, 564 U.S. at 361). As a result, Rule 23(b)(2) classes need only be "cohesive" and not necessarily ascertainable. Id. at 561.

Thus, for certification of a Rule 23(b)(2) class seeking only declaratory or injunctive relief, a properly defined class is one that: "(1) meets the requirements of Rule 23(a); (2) is sufficiently

cohesive under Rule 23(b)(2) . . .; and (3) is capable of the type of description by a 'readily discernible, clear, and precise statement of the parameters defining the class,' as required by Rule 23(c)(1)(B)." Shelton, 775 F.3d at 563. No additional requirements need be satisfied. Id.

Examining Plaintiffs' proposed class definitions under these standards, I find that the definitions are neither ambiguous nor unworkable. As set forth above, Plaintiffs seek to certify two classes:

> A.     All parents as defined by 34 C.F.R. § 300.30(a) with limited English proficiency and whose children now or in the future are enrolled in the School District of Philadelphia and identified or eligible to be identified as children with a disability within the meaning of the IDEA and/or Section 504 and related state laws ("Parent Class"); and

> B.     All students who now or in the future are enrolled in the School District of Philadelphia in grades kindergarten through the age of legal entitlement who are identified or eligible to be identified as children with a disability within the meaning of the IDEA and/or Section 504 and related state laws, whether or not they are classified as English language learners and whose parents as defined by 34 C.F.R. § 300.30(a) are persons with limited English proficiency ("Student Class").

(Am. Compl. ¶ 51.)

The requirement—found in both proposed classes—that the parents are persons with "limited English proficiency" provides sufficient outer boundaries and defines a cohesive class of individuals on which the requested injunctive may be awarded. As Plaintiffs accurately note, the term "limited English proficient" is generally construed to be found where (1) English is not the person's primary language, and (2) the person has limited ability to read, write, speak, or understand English. See Dept. of Justice & Dept. of Educ., "Dear Colleague Letter: English Learner Students and Limited English Proficient Parents," at 37 (Jan. 7, 2015), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-el-201501.pdf; "Guidance to Federal

Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons," 67 Fed. Reg. 41455, 41457 (June 18, 2002). While a determination of the language proficiency of each class member will be necessary to determine their inclusion in the class, the overarching legal claims turn only on the School District's conduct, *i.e.*, whether it provided appropriate oral and written translation services in the IEP process. Thus, the merits of requested injunctive relief will focus on the lawfulness of the School District's actions and will either apply to all of the class members or none of them. Precise ascertainability is unnecessary.

### B. **Rule 23(a) Requirements**

The resolution of the School District's general arguments against class certification does not end the class certification inquiry. Plaintiffs must still satisfy the rigorous analysis of Federal Rule of Civil Procedure 23(a). As noted above, Federal Rule of Civil Procedure 23 sets forth four general preconditions that a putative class complaint must satisfy before any case is certified as a class action: (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The requirements of Rule 23(a) are meant to assure both that "class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." Baby Neal, 43 F.3d at 55.

The School District contends that none of the Rule 23(a) requirements have been satisfied. Upon careful and "rigorous" review of the evidence presented by the parties on these elements, I find that Plaintiffs have failed to prove, by a preponderance of the evidence, either numerosity or

commonality.  Although the absence of any one of the Rule 23(a) factors constitutes grounds for denial of class certification, I will discuss all four elements for purposes of comprehensiveness.

1. <u>Numerosity</u>

A plaintiff seeking certification must demonstrate that the class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  "In recent years, the numerosity requirement has been given 'real teeth.'"  <u>Mielo v. Steak 'n Shake Operations, Inc.</u>, 897 F.3d 467, 484 (3d Cir. 2018).  Third Circuit precedent demands that a court "make a factual determination, based on the preponderance of the evidence, that Rule 23's requirements have been met."  <u>Id.</u> (quoting <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d 583, 596 (3d Cir. 2012)).  Thus, a party seeking class certification must prove (a) a sufficiently large number of potential class plaintiffs and (b) impracticability of joinder.

The first part of the numerosity inquiry is the size of the class.  "No magic number exists satisfying the numerosity requirement, nor must plaintiff allege the exact number or identity of class members."  <u>Moskowitz v. Lopp</u>, 128 F.R.D. 624, 628 (E.D. Pa. 1989); <u>see also</u> <u>Chakejian v. Equifax Info. Servs., LLC</u>, 256 F.R.D. 492, 497 (E.D. Pa. 2009); <u>Mylan Pharms, Inc. v. Warner Chilcott Public Ltd. Co.</u>, No. 12-3824, 2013 WL 6145117, at *2 (E.D. Pa. Nov. 20, 2013).  As a general rule, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met," <u>Stewart v. Abraham</u>, 275 F.3d 220, 226–27 (3d Cir. 2001), whereas a class of fifteen to twenty is likely too small to meet the numerosity requirement.  <u>In re Modafinil Antitrust Litig.</u>, 837 F.3d 238, 250 (3d Cir. 2016).  Classes with between twenty-one and forty members are given varying treatment, depending on the circumstances of each case.  <u>Id.</u>

A party seeking certification must present evidence that would enable the reviewing court to make a factual determination, without resorting to mere speculation, that Rule 23(a)'s requirements have been met. Mielo, 897 F.3d at 484. Although "Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members . . . in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding." Hayes, 725 F.3d at 357 (quoting Marcus, 687 F.3d 596–97). A court may use common sense assumptions to determine whether numerosity has been satisfied. Mielo, 897 F.3d at 486.

"[C]ommon sense" cannot, however, be relied on without evidence. Marcus, 687 F.3d at 596–97. "[W]here a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone." Hayes, 725 F.3d at 358. In other words, while it may be "tempting to assume" that a class meets a numerosity requirement based on the fact that the class members will be drawn as a subset from a larger pool, the Third Circuit "has rejected the idea that giving in to such temptation could excuse speculation." Mielo, 897 F.3d at 485 (quotation omitted).

Several recent cases from the Third Circuit are illustrative. In Marcus v. BMW of N. Am., LLC, the plaintiff sought to bring a class action on behalf of all purchasers and lessees of certain model-year BMWs equipped with Bridgestone run-flat tires sold or leased in New Jersey with tires that have gone flat and been replaced. 687 F.3d at 588. The Third Circuit found that although there was evidence of BMW purchases on a nationwide scale, there was no evidence indicating the portion of those purchases that might have occurred in New Jersey, which was the geographic limitation of the relevant class. Id. at 597. Absent evidence specific to BMWs purchased or leased

in New Jersey with Bridgestone run-flat tires that had gone flat and been replaced, the court declined to find numerosity.  Id.

Subsequently, in Hayes v. Wal-Mart Stores, Inc., the plaintiff alleged that a retailer violated a state consumer fraud statute by selling unredeemable service plans for products that were in reality sold "as-is."  725 F.3d at 352.  The plaintiff presented evidence of over 3,500 transactions that included both the sale of a service plan and a price override, which is something that a store cashier did when selling an "as-is" product.  Id. at 353.  The Third Circuit held that because price overrides were performed in many other situations, and that transactions falling within these other scenarios were not part of the class definition, plaintiff had not proved numerosity.  Id. at 357–58.

Finally, in Mielo v. Steak 'n Shake Operations, Inc., the plaintiffs sought to certify a Rule 23(b)(2) class of all persons with qualified mobility disabilities who were or would be denied access to any Steak 'n Shake restaurant location on the United States because of accessibility barriers at any Steak 'n Shake restaurant where the defendant owns, controls, and/or operates the parking facilities.  897 F.3d at 475.  To prove numerosity, the plaintiffs pointed to (a) census data showing that there were between 14.9 million and 20.9 million persons with mobility disabilities in the United States, (b) a "single off-hand comment" by a Steak 'n Shake executive speculating that it would be "fair to say" that thousands of people with disabilities use the Steak 'n Shake parking lots each year, and (c) "common sense."  Id. at 486.  The Third Circuit found that such evidence, combined with common sense assumptions, did not allow for a finding of numerosity. It reasoned that there was no evidence permitting a common sense inference to determine the portion of mobile-disabled individuals who had or would patronize a relevant Steak 'n Shake restaurant, let alone experience ADA violations, and that the Steak 'n Shake executive's statement was simply speculation, not evidence.  Id. at 486.

Here, in support of their claim of numerosity, Plaintiffs allege that both the Parent Class and the Student Class are so numerous that joinder of all members is clearly impracticable. To prove the size of the class, Plaintiffs provide records from the School District establishing that during the 2015–2016 and 2016–2017 school years, there were 3,507 and 3,782 special education students, respectively, who lived in a household with a home language other than English. (See Pls.' Mot. for Class Cert., Ex. 6.) Plaintiffs further rely upon the School District's admissions that as of November 2013, there were approximately 25,990 families in the School District overall that did not have a primary home language of English, some 19,670 of which expressly requested documents in a language other than English. (Am. Compl. ¶ 61, Am. Answer ¶ 61.) During that same time period, the School District reported more than 1,500 English language learner students receiving special education services across the district and 1,887 students with IEPs whose records indicated that their home language was not English. (Am. Compl. ¶ 62, Am. Answer ¶ 62.) Plaintiffs also offer statements from multiple witnesses—individuals that either are or work with limited English proficient parents of children with disabilities—who represent their experiences navigating the School District's special education process. (See Pls.' Reply Br., Ex. B; Pls.' Mot. for Class Cert., Exs. 19 and 20.) Based on this evidence, Plaintiffs ask the Court to make the common-sense inference that the number of putative class members in this case well exceeds the minimum required by the Third Circuit.

Plaintiffs' evidence suffers from the same speculative deficiencies identified in Mielo, Hayes, and Marcus. While Plaintiffs' evidence may prove the existence of a larger pool of individuals, it fails to focus on whether parents of children with disabilities have limited proficiency with the English language.

It is undisputed that a substantial number of students in the Philadelphia School District with limited English proficiency are also identified as children with a disability within the meaning of IDEA and/or Section 504 of the Rehabilitation Act. Focusing on both the Parent Class and Student Class, the inquiry here is whether these children *also* have *parents* who have limited English proficiency. Plaintiffs' reliance on the number of special education students with a home language other than English is problematic because it relies on the unsupported assumption that a different primary language equates with and proves a lack of English language proficiency.

Under the definition of "limited English proficient" advocated by Plaintiffs above, an LEP person has two characteristics: (1) English is not the person's primary language, <u>and</u> (2) the person has limited ability to read, write, speak, or understand English. Plaintiffs' evidence addresses only the first characteristic. The theory that a home with a primary language other than English thus proves that the parents in that home are limited English proficient fails to acknowledge the very real possibility that the parent may also be multilingual or proficient in English.

Evidence of record illustrates this point. Marie Capitolo, a special education teacher in the School District, testified that, during her sixteen years in the District, forty to fifty percent of her students were English language learners, but that, aside from one or two students, *most of their parents spoke English*. (Defs.' Opp'n Class Cert., Ex. D, Dep. of Marie Capitolo ("Capitolo Dep."), 16:19–17:19 (emphasis added).) Donna Sharer, Ph.D., a teacher in the School District, testified that the District's Home Language Survey does not monitor a parent's English language proficiency; rather, the only way a school or teacher would know is through anecdotal evidence from the student. (Def.'s Opp'n Class Cert., Ex. W, Dep. of Donna Sharer ("Sharer Dep."), 26:10–29:10, 51:24–53:7.)[5]

---

[5]     The testimony/declarations of Ms. Ling, Ann Perng, and Bonita McCabe do little to advance Plaintiffs' showing as they merely refer to being involved with "dozens of IEP meetings

In an effort to overcome these deficiencies, Plaintiffs contend that the District fails to track whether parents of their students have limited English proficiency.[6] This argument does not rescue Plaintiffs' claim of numerosity for several reasons. First, the Third Circuit has held that "the nature or thoroughness of a defendant's recordkeeping does not alter the plaintiff's burden to fulfill Rule 23's requirements." Hayes, 725 F.3d at 356. Second, the School District does, in fact, maintain records of *requests* by parents for interpretation and translation services in cases of both regular education and special education students. (Def.'s Opp'n Class Cert., Ex. I, Dep. of Natalie Hess ("Hess Dep."), 304:24–305:21; Ex F, Dep. of Ludy Soderman ("Soderman Dep."), 112:1–13:21.) Yet, despite bearing the burden of proving numerosity, Plaintiffs have neither compiled this information in order to establish the requisite number of potential class members nor established that the School District somehow had an obligation to maintain records about the language proficiency of parents, specifically those with a student in special education.[7]

It is "tempting to assume" that because there are substantial numbers of special education students with a home language other than English, then a subset of that pool—*i.e.*, special education students whose parents are limited English proficient—would easily satisfy the

_____

with LEP parents," (Pls.' Mot. Class Cert., Ex. 19, ¶ 6); attending "numerous IEP meetings, including some meetings with [LEP] parents of students with disabilities," (Id., Ex. 20, ¶ 3); or talking to some "other parents" who were LEP with special education students without knowing whether those parents were able to meaningfully participate in their child's education. (Pl.'s Reply Br., Ex A, Dep. of Manquing Lin ("Lin Dep."), 91:5–93:23, 169:1–9.)

[6]     (See Pls.' Mot. Class Cert., Ex. 7, Dep. of Natalie Hess ("Hess Dep.") 80:14–16 (noting that the School District did not separately track how many special education students have parents who are limited English proficient).)

[7]     To the extent Plaintiffs rely on the Report for the Pennsylvania Department of Education to prove numerosity, such reliance is misplaced. That Report found that only two of the twenty-five files reviewed by the Department indicated that the required forms of notice to parents were provided to parents in their native language. Notably, the Department did not review the files to determine whether the parents were LEP, only whether the students had a native language other than English.

numerosity requirement. But the Third Circuit "has rejected the idea that giving in to such temptation could excuse speculation." Mielo, 897 F.3d at 485 (quotation omitted). Plaintiffs' argument conflates the evidence-based "common sense assumption" that falls within judicial discretion with the "speculation" that the Third Circuit has deemed impermissible in a numerosity inquiry. While Plaintiffs are entitled to offer proof that is circumstantial in nature, the fact that the proof is not specific to the parties or the problem covered by the class definition precludes me from relying on "common sense" to "forego precise calculations and exact numbers." Marcus, 687 F.3d at 596–97.

Even assuming *arguendo* that Plaintiffs could establish the size of the potential class, Plaintiffs have not offered sufficient proof of the second half of the numerosity inquiry, *i.e.*, that joinder is impracticable. Whether joinder of all of the class members would be impracticable depends on the circumstances surrounding the case and not merely on the number of class members. In re Modafinil, 837 F.3d at 249. The Third Circuit has enumerated a non-exhaustive list of factors to consider, including: judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages. Id. at 253. Of those factors, both judicial economy and the ability to litigate as joined parties are of primary importance. Id.

Plaintiffs argue—without reference to any proof—that it would be impracticable to join all class members here because, by definition, both classes require the involvement of individuals who are limited English proficient and have limited resources. Plaintiffs, however, have not provided any analysis of the combined considerations on the factors of judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, an accurate measure of financial

resources, or geographic dispersion, several of which appear to weigh against certification. Moreover, as the Third Circuit has emphasized, the mere fact that Plaintiffs here seek injunctive relief does not ease their burden in satisfying Rule 23(a)(1). <u>Mielo</u>, 897 F.3d at 487. Absent further evidence or argument, I cannot find that Plaintiffs have established this element by a preponderance of the evidence. Accordingly, I find that Plaintiffs have failed to prove numerosity under the rigorous standards within this Circuit.

### 2. <u>Commonality</u>

Rule 23(a)(2) next requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[C]ommonality does not require perfect identity of questions of law or fact among all class members. Rather, 'even a single common question will do.'" <u>Reyes v. Netdeposit, LLC</u>, 802 F.3d 469, 486 (3d Cir. 2015) (quoting <u>Dukes</u>, 564 U.S. at 359). "The focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendant[s'] conduct was common as to all of the class members." <u>Rodriguez v. Nat'l City Bank</u>, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation and citations omitted). All plaintiffs need not suffer the same injury; rather, the fact that the plaintiffs were subject to the injury or faced the immediate threat of these injuries suffices for Rule 23. <u>Baby Neal</u>, 43 F.3d at 57 (3d Cir. 1994); <u>see also</u> <u>Rodriguez</u>, 726 F.3d at 383 ("[T]here may be many legal and factual differences among the members of a class, as long as all were subjected to the same harmful conduct by the defendant."). "Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded." <u>Baby Neal</u>, 43 F.3d at 56. Ultimately, the commonality bar is not a high one. <u>Rodriguez</u>, 726 F.3d at 382.

Nonetheless, the Rule 23(a)(2) "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" <u>Dukes</u>, 564 U.S at 349 (quotations

omitted). A complaint's mere recital of superficial questions that happen to be shared by class members, such as whether each class member suffered a violation of the same provision of law, is "not sufficient to obtain class certification." Id. Rather to satisfy Rule 23(a)(2), the resolution of the common question of law or fact must "resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 350.

Here, Plaintiffs allege that that there are multiple questions of fact and law common to the proposed class:

- Whether the District fails on a systemic basis to provide members of the Parent Class adequate interpretation and translation services to allow them to participate meaningfully in the special education planning process for their children.

- Whether the current policies, procedures, and practices of the District governing the translation of various special education process documents, and provision of interpretation services (including when and how interpretation and translations services are requested by parents/guardians, and what criteria the District relies on to determine whether or not to translate these documents) are sufficient to ensure meaningful participation in the special education process.

- Whether the District fails to comply with its policies and procedures with respect to the translation or interpretation of IEP process documents.

- Whether the District fails to effectively notify parents of their right to request translation and/or interpretation of IEP process documents.

- Whether there are a sufficient number of qualified and trained interpreters available to provide effective language services to members of the parent Class at IEP meetings.

- Whether the policies, procedures, and practices of the District with respect to language services (translations and interpretations) provided to members of the Parent Class and Student Class violates the IDEA, ADA, Section 504, the EEOA, Title VI, and provisions of Chapter 14, Chapter 15, and Chapter 4 of the Pennsylvania School Code.

(Pls.' Mem. Supp. Class Cert. 15–17.) Plaintiffs assert that these are systemic challenges to the School District's practices, policies, and procedures that are common to all class members, even if the impact of the School District's conduct varies from class member to class member.

In support of commonality, Plaintiffs rely on two cases. In <u>Baby Neal for and by Kanter v. Casey</u>, 43 F.3d 48 (3d Cir. 1994), suit was brought on behalf of children who had been placed in the legal care and custody of Philadelphia's Department of Human Services ("DHS"). <u>Id.</u> at 53–54. The plaintiffs alleged that a wide variety of systemic deficiencies prevented DHS from providing abused and neglected children with the necessary welfare services, including failure "(1) to satisfy legal mandates for child protective services investigations; (2) to adhere to the caseload maximum of 30 cases per caseworker; (3) to assign to a substantial number of foster children a caseworker to monitor foster care placement and to ensure that the children received necessary and appropriate services; (4) to ensure that foster parents received the training necessary to permit them to care for foster children; and (5) to provide any child whose records were reviewed with an adequate case plan." <u>Id.</u> The district court found that commonality was not satisfied because each of the plaintiffs had his or her own individual circumstances and need, and that the class could not complain about a single common injury. <u>Id.</u> at 54. The Third Circuit reversed, finding that the individualized circumstances did not negate a finding of commonality. <u>Id.</u> Rather, it held that the plaintiffs' challenges to a program's compliance with the mandates of its enabling legislation, even where plaintiff-beneficiaries were impacted differently by the violations, satisfied the commonality requirement, particularly where the plaintiffs requested only "declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them." <u>Id.</u> at 56–57.

Plaintiffs also cite to <u>P.V. ex rel. Valentin v. School District of Philadelphia</u>, 289 F.R.D. 227, 231 (E.D. Pa. 2013), where the plaintiffs sought to certify a class consisting of students with autism in grade levels K–8 in the School District.  <u>Id.</u> at 230–31.  Plaintiffs' claims were based on the School District's provision of autism support classrooms for children, who were  generally divided into three "grade levels" based on age.  <u>Id.</u>  A specific school, however, sometimes offered only one grade level of autism support and when the student completed the highest grade level provided in that school, the School District would transfer that student to a different school, referred to as "upper-leveling"  <u>Id.</u>  The plaintiffs sought to either eliminate the upper-leveling process in its entirety, or to allow for parental notice and involvement—in accordance with the mandated individual planning process of the IDEA—which the School District conceded was absent.  <u>Id.</u>

Based on these facts, the district court certified the class, finding that "the central tenet of Plaintiffs' Complaint alleges a systemic failure, not a failure of the policy as applied to each member individually."  <u>Id.</u> at 234.  The district court found that the plaintiffs' challenge to the "upper-leveling policy" required a number of factual and legal determinations common to all class members, including: whether the School District upper-levels autistic students without meaningful parental involvement, whether the School District upper-levels autistic students without providing prior written notice to the parents, whether the School District considers the individual needs of autistic students prior to deciding where to upper-level that student, and whether the School District's "policy" of upper-leveling deprives putative class members of a free and appropriate public education.  <u>Id.</u>

At first glance, the present class action seems to make systemic challenges similar to those raised in <u>Baby Neal</u> and <u>P.V.</u>, as they concern the provision of language-based services to a

similarly-situated group of individuals. Closer scrutiny, however, reveals a distinction between the mandates of the enabling legislation in these cases and the mandates of the enabling legislation at issue in this case. Both Baby Neal and P.V. involved a common violation of a statutory mandate, irrespective of the disparate injuries to the class. By contrast, the legal crux of this matter does not turn on any statutory or regulatory mandate that the School District provide translation and interpretation services in connection with the provision of special education services. Indeed, Plaintiffs have not identified any such independent requirement that such language-based services are required. Rather, the statutory mandate at issue here—stemming from the IDEA—is the requirement that the School District provide enough language services to allow for "meaningful participation" by parents in the education of their special needs students. Thus, the crucial question in this lawsuit is whether the translation and interpretation services provided by the School District were so inadequate as to deny class members the opportunity for "meaningful participation." For the reasons that follow, I find that the amorphous and individualized nature of "meaningful participation" precludes a finding of commonality.

The outer parameters of the right to "meaningful participation," for purposes of the IEP process, are enumerated in the regulation entitled "Parent Participation," in pertinent part as follows:

> (a) Public agency responsibility—general. Each public agency must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate, including—
> (1) Notifying parents of the meeting early enough to ensure that they will have an opportunity to attend; and
> (2) Scheduling the meeting at a mutually agreed on time and place.
> . . .
> **(e) Use of interpreters or other action, as appropriate. The public agency must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting,**

> *including arranging for an interpreter for parents with deafness*
> *or whose native language is other than English.*

> . . .

34 C.F.R. § 300.322 (emphasis added). Notably, the statute only requires "interpreters or other action" on an "as appropriate" basis as needed to ensure meaningful parent participation.

Given the above framework, the "meaningful participation" standard is not subject to common enforcement. As characterized by the United States Court of Appeals for the Sixth Circuit, "[p]articipation must be more than a mere form; it must be meaningful." Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 858 (6th Cir. 2004) (emphasis omitted). The IDEA recognizes the importance—and, indeed the necessity—of parental participation in both the development of an IEP and any subsequent assessment of its effectiveness. Honig v. Doe, 484 U.S. 305, 311 (1988). "[I]t establishes various procedural safeguards which guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education, and the right to seek review of decisions they believe are inappropriate." Colonial Sch. Dist. v. G.K. by and through A.K., No. 17-3377, 2018 WL 2010915, at *12 (E.D. Pa. Apr. 30, 2018). "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." Bd. of Educ. v. Rowley, 458 U.S. 176, 205–06 (1982). As stated by the United States Supreme Court:

> These safeguards include the right to examine all relevant records pertaining to the identification, evaluation, and educational placement of their child; prior written notice whenever the responsible educational agency proposes (or refuses) to change the child's placement or program; an opportunity to present complaints concerning any aspect of the local agency's provision of a free appropriate public education; and an opportunity for "an impartial due process hearing" with respect to any such complaints.

Honig, 484 U.S. at 311–12.

"Meaningful participation," therefore, does not proscribe a certain course of conduct by a school district, but rather requires a fact-intensive inquiry into the individual circumstances.   See, e.g., WQ.D. v. Watchung Hills Reg'l High Sch. Bd. of Educ., 602 F. App'x 563, 568–69 (3d Cir. 2015) (finding that parent was not denied opportunity for meaningful participation when school refused to adequately respond to inquiries regarding methodology to be used in the reading program and related teacher qualifications where parent was present at IEP meeting and was offered the opportunity to personally observe the proposed program); L.G. v. Fair Lawn Bd. of Educ., 486 F. App'x 967, 972 (3d Cir. 2012) (holding that the fact that the child study team met without the child's parents to develop a proposed IEP and ultimately disagreed with parents does not mean parents were denied meaningful participation; "Federal and state regulations require that the parents of a child with a disability be afforded the opportunity to participate in meetings about a child's placement; however parents need not be included in 'preparatory activities that public agency personnel engage in to develop a proposal or response to a parent proposal that will be discussed at a later meeting.'"); D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 565 (3d Cir. 2010) (finding that although parents' letters containing inquiries went unanswered for months, parents had an opportunity to participate meaningfully in the creation of an IEP for their son that was in effect for most of his ninth-grade year); Fuhrmann on Behalf of Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1036 (3d Cir. 1993) (finding meaningful participation where parents were presented with a draft IEP at a meeting, parent made several suggestions as to how it might be changed, and some suggestions were incorporated into the IEP).   Ultimately, a denial of meaningful participation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits.  D.S., 602 F.3d at 565.

As the above cases demonstrate, "meaningful participation" is assessed on an individual basis. Here, Plaintiffs do not allege that the School District failed to provide *any* interpretation or translation services. Indeed, the evidence demonstrates that parents of special education students are provided with a Procedural Safeguards Notice, translated into eight common languages, that specifically details the parents' "[r]ight to enlist the District's interpretation and/or translation services," including BCAs (bilingual counseling assistants), and may seek additional remedies if they believe the services provided "do not permit [the] meaningful participation in the IEP process." (Def.'s Opp'n Class Cert., Ex. C ¶ 7, Ex E.) Anyone can request a BCA from the website through the special education liaison prior to an IEP meeting. (Hess Dep. 50:7–18.) The School District also has a telephone-based "Language Line" to provide interpretation services to parents. (Pl.s' Mot. Class Cert., Ex. 9, Dep. of Kim Caputo ("Caputo Dep.") 125:19–127:9; Hess Dep. 122:1–6.)

Multiple witnesses also testified at deposition that the School District did provide some interpretation/translation services. Named Plaintiff Lin acknowledged that prior to one of her IEP meetings, an interpreter was provided by the School District to review her child's reevaluation report, and a copy of the initial Independent Evaluation Report was provided to her in Chinese. (Def.'s Opp'n Class Cert, Aff. of Manqing Lin ("Lin Aff."),¶ 8.) Prior to any meeting she attended, Ms. Lin was offered interpretation services, but there were some instances where she declined those services. (Capitolo Dep. 74:7–23.) For named Plaintiff Perez, the School District had a BCA present at her meeting, but she elected to bring her own two interpreters and did not ask for the IEP documents to be translated into Spanish before, during, or after the meeting. (Id. at 222:12–24.) Former named Plaintiff Ms. Galarza chose to have her child's teacher act as an

interpreter at the meeting and felt as though she was able to understand the proceedings. (Def.'s Opp'n Class Cert., Ex. B, Dep. of Barbara Galarza ("Galarza Dep.") 14:8–15:20.)

Thus, the question is not whether the School District must provide language-based services, but rather whether the interpretation and translation services already provided by the School District were or continue to be adequate to ensure the "meaningful participation" of the parents in the Parent Class and the parents of the students in the Student Class. As the above differing circumstances demonstrate, there is no commonality among Plaintiffs. This is because there are varying circumstances that could affect whether the particular services provided by the School District were enough or were insufficient to satisfy the right of meaningful participation.[8] Plaintiffs appear to acknowledge this reality in the framing of their "common questions." They ask whether the School District's interpretation and translation policies are "sufficient," whether the District's notices are "effective," and whether the language services provided are "effective."

Moreover, the class questions Plaintiffs raise do not challenge a centralized policy enforced by a single decision-maker, but rather target individualized decisions by various case supervisors,

---

[8]     (See also Pls.' Mot. to Certify, Ex. 1, Dep. of Barbara Galarza ("Galarza Dep."), 14:8–16:9, 45:3–24, 52:6–17, 61:2–28 (acknowledging that some portions of an IEP plan were interpreted into Spanish and she understood what the plan was); Capitolo Dep. 21:10–21 (noting that she attended multiple IEP meetings where an interpreter was present both in cases where the parents spoke no English and where the parents spoke English, in order to make sure the parents understood everything); Pls.' Mot. to Certify, Ex. 3, Dep. of Madeline Perez ("Perez Dep."), 10:4–24, 72:4–73:6, 109:11–16 (conceding that two evaluations of her child were translated entirely into Spanish, but noting that on other occasions, an IEP would have only the title and headers translated; remarking that she understood some of the IEP plan for her child); Pl.'s Mot. to Certify, Ex. 4, Dep. of Manqing Lin ("Lin Dep."), 127:1–3,145:6–147:3, 157:7–24, 162:11–21 (remarking that although the IEP report was not fully translated into Chinese prior to her meeting, the School District explained the IEP and she was able to provide input to the team).)

The Pennsylvania Department of Education Report, submitted as a supplement to the record, does not support any finding of commonality as it makes no findings about any denials of a right to meaningful participation based on lack of language-based services. In fact, it actually notes that in 92% of the files it reviewed, "students were provided with a FAPE [free, appropriate public education] within the first ten school days." (Pl.'s Mot. to Supplement, Ex. A.)

school principals, and teachers as to what services are required in each particular case. The evidence of record reflects that the School District provides significant discretion to the relevant child-study personnel—consistent with the regulations which require use of interpreters or other action, "as appropriate"—to engage parents and provide appropriate language services. See 34 C.F.R. § 300.322. As special education teacher Marie Capitolo testified, "Every parent comes with a totally different set of circumstances . . . . Every parent's ability to participate is different. Some parents, I would not provide the documents translated because they can't read. Some parents don't have information overload from one meeting, so I wouldn't have to have multiple meetings for them." (Capitolo Dep. 120:21–121:8.) She went on to note that although she would definitely have an interpreter for a non-English-speaking parent, she may not have an interpreter for limited English proficient parents who are fluent enough conversationally to allow a back-and-forth with the school without interruption. (Id. at 121:19–122:8.) Thus, discretion is necessary to ensure that limited English proficient parents are given the tools they need to participate without, for example, taking the unnecessary steps of translating documents for parents who are unable to read proficiently or for whom written translation of a complex document would be overwhelming. (Def.'s Opp'n Class Cert., Ex. V.)

In light of the foregoing, I find this case—unlike both Baby Neal and P.V.— does not challenge broad-based, systemic failures or policies by the School District. Rather, it challenges how specific applications of that policy affect each member individually. Put another way, while the School District's provision of translation or interpretation services might, in some cases, deny a parent the right of meaningful participation, that same conduct may, in other cases, sufficiently allow a parent to meaningfully participate in their child's IEP process. The decision as to which language-based services to provide is decentralized and varies from parent-to-parent and school-

to-school, making the remedy not appropriate for class resolution. See Jones v. GPU, Inc., 234 F.R.D. 82, 92 (E.D. Pa. 2005) (recognizing that class certification may not be appropriate where decision making was decentralized).

My conclusions are supported by the recent Third Circuit case of Mielo v. Steak 'n Shake, 897 F.3d 467 (3d Cir. 2018). There, the named plaintiffs claimed to have personally experienced difficulty ambulating in their wheelchairs through two sloped parking facilities, and sought injunctive relief requiring Steak 'n Shake to adopt centralized corporate policies crafted to ensure that potential discriminatory access violations were actively sought out and corrected. Id. at 474–75. The proposed class encompassed not only persons who alleged that they had experienced ADA violations within a Steak 'n Shake parking facility, but also class members who encountered "accessibility barriers at any Steak 'n Shake restaurant" throughout the country. Id. at 488. Reversing the district court's class certification, the Third Circuit noted that "[a]lthough all class members might allege a violation of the ADA—even the very same provision of the ADA—this only establishes that putative class members 'merely' allege to 'have all suffered a violation of the same provision of law.'" Id. at 489. Because of the potentially wide array of different claims by different members of the class, the Third Circuit declined to find commonality. See also Coleman v. Commonwealth Land Title Ins. Co., 318 F.R.D. 275, 284 (E.D. Pa. 2016) (finding that claims under the Uniform Trade Practices and Consumer Protection Law were "inappropriate for class treatment" for lack of commonality because justifiable reliance, which is an element of that claim, requires individual inquiries into each class member's transaction).

Similarly here, the right of "meaningful participation" under the IDEA can be violated in many different ways. Merely requiring the School District to remedy "systemic deficiencies" in language services does not provide a "common answer[] apt to drive the resolution of the

litigation." Dukes, 564 U.S. at 350. This is not to say that individual class members do not have valid claims against the School District for failure to provide sufficient language services to permit them to meaningfully engage in the special education process. Indeed, it is likely that some of the class members share some questions with some other members of the class. But given the individualized and fact-specific nature of the issues, none of the class members appear to share any one question with the entire class, thus making the issues not conducive to a collective resolution. Accordingly, I find that Plaintiffs have not satisfied their burden under Rule 23(a)(2).

      3.     Typicality

The third Rule 23(a) factor considers typicality. "Typicality" aids a court in determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Marcus, 687 F.3d at 597–98 (citing Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 158 n.13 (1982)). Typicality "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." Id. at 598. To determine whether a named plaintiff is markedly different from the class as a whole, the court must address three distinct concerns: "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." Id. at 598 (quotations omitted).

The parties here dispute whether the named Plaintiffs may be subject to unique defenses and, thus, are not "typical" of the class. Questions regarding defenses uniquely available to the defendants against the named plaintiff bear on both the typicality and adequacy of a class representative. Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006). The fear is that "the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." Id. at 297. Thus, to defeat class certification "a defendant must show some degree of likelihood [that] a unique defense will play a significant role at trial," *i.e.*, the parties will spend much of their time and effort leading up to and at trial on issues that bear only on the specifics of the class representative's particular claim, and will distract the litigants from the concerns of the class. Id. at 300.

The School District contends that neither Plaintiff Lin nor Plaintiff Perez satisfies the typicality requirement of Rule 23(a). I will address each individually.

### a. Plaintiff Lin

First, the School District argues that named Plaintiff Lin is subject to a unique defense as her claims are barred by a Mediation Agreement she entered into with the School District on August 18, 2016. (Def.'s Opp'n Class Cert., Ex. O.) Specifically, after the School District conducted an evaluation of Ms. Lin's child, it sent her an Evaluation Report that was not translated into her native language until after the IEP meeting. (Lin Dep. 144:15–147:15.) As a result, Ms. Lin did not fully understand the implications of the Evaluation Report and could not raise concerns about its recommendations. (Id.) After she became aware that the Evaluation Report did not address her child's needs, Ms. Lin requested a mediation with the School District in order to obtain

an Independent Education Evaluation. (Id. at 136:5–137:7.) On August 18, 2016, Ms. Lin and the

School District entered into a binding Mediation Agreement that provided, in pertinent part, that:

> To facilitate full inclusion of the Parent(s) in the IEP Process:
>
> a.      District will provide a hard copy and email copy of the IEP and any reports i.e., evaluations, and other relevant documents, 10-days in advance.  The district will provide competent language interpretation services to review these documents in advance with parent(s).
> b.      District will provide the final copy of the IEP and evaluation reports in simplified Chinese.

(Def.'s Opp'n Class Cert., Ex. O; Capitolo Dep. 60:17–61:5.)  The Mediation Agreement is

deemed "legally binding and enforceable in a state court of competent jurisdiction or in a district

court of the United States."  (Def.'s Opp'n Class Cert., Ex. O.)

The School District now argues that the Mediation Agreement bars Ms. Lin's attempts to

seek, on behalf of the class, that all *draft* IEPs and Evaluations be translated.  The plain language

of the Mediation Agreement, however, only contemplated and addressed her right to receive an

Independent Education Evaluation, and explicitly referenced the development of the subsequent

IEP emanating therefrom.  As noted by Plaintiffs, the Agreement did not address all of Ms. Lin's

son's special education documents in perpetuity or permanently determine the language access

services provided to Ms. Lin.  In turn, I do not find that Ms. Lin is subject to a unique defense will

play a significant role at trial.[9]

---

[9]      The School District argues that an attempt to characterize the Mediation Agreement as applicable to only a discrete period of time is at odds with her own understanding of the agreement. They note that Ms. Lin sent to the agreement to the school principal in March 2017, seven months after signing it, as support for her demand that a particular interpreter be present, evidencing her belief that the agreement remained in effect.

    Ms. Lin's understanding of the Mediation Agreement, however, has no bearing on its actual effect.  Rather, the plain language of the Mediation Agreement reveals that it was limited to the IEP issue in dispute at that time; it says nothing about future disputes.

*b. Plaintiff Perez*

The School District also contends that the claims of Ms. Perez and her son L.R. are not typical because of an existing settlement agreement between her and the School District. Specifically, between 2012 and 2016, the School District allegedly refused to fully translate L.R.'s IEP process documents and would only translate the documents' section headings. In February 2017, Ms. Perez signed a settlement agreement related to L.R. so that L.R. could move to a private school. (Perez Dep. 26:13–20, 26:13–27:11; ECF No. 54-1.) According to the School District, this settlement agreement bars any claims that arose prior to the agreement's execution in February 2017. Subsequent to February 2017, Ms. Perez has not requested that the School District translate any documents. (Perez Dep. 35:10–37:13, 45:19–46:1.) The School District now contends that these circumstances, plus the unique defense of the settlement agreement, are not typical of the other members of the Student Class or Parent Class.

"[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." Baby Neal, 43 F.3d at 58 (quotation omitted). Nothing in Ms. Perez's situation presents "the sorts of dangers that the typicality requirement was intended to avoid." Id. at 63. Although Ms. Perez cannot pursue a cause of action for pre-February 2017 events, and has not yet had a new situation arise, the Third Circuit has noted that the "individual interest in pursuing litigation where the relief sought is primarily injunctive will be minimal." Id. (quotations omitted). Consequently, I find no danger that Ms. Perez has unique interests or circumstances that will motivate her to litigate in a way that prejudices the absentees. In turn, I find that the typicality requirement is satisfied.

4. <u>Adequacy of Representation</u>

The last Rule 23(a) factor considers adequacy of representation. "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." <u>In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.</u>, 795 F.3d 380, 393 (3d Cir. 2015). The adequacy requirement has two components: (1) the interests and incentives of the representative plaintiffs; and (2) the experience and performance of class counsel. <u>Dewey v. Volkswagen Aktiengesellschaft</u>, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted). The School District challenges both prongs.

a. *Representative Plaintiffs*

The first part of the adequacy inquiry focuses primarily on whether the class representatives have conflicts of interest with the putative class members. <u>Williams v. Sweet Home Healthcare, LLC</u>, 325 F.R.D. 113, 122 (E.D. Pa. 2018) (citing <u>New Directions Treatment Servs. v. City of Reading</u>, 490 F.3d 293, 313 (3d Cir. 2007)). Only a "fundamental" conflict of interest will be sufficient to impact the adequacy analysis. <u>Id.</u> (citing <u>Dewey</u>, 681 F.3d at 183). "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." <u>Dewey</u>, 681 F.3d at 183 (internal quotation marks omitted)).

The School District alleges that neither named Plaintiff is an adequate class representative. As to Ms. Lin, the School District contends that "there are significant issues with her credibility, most notably that she 'speaks terrific English.'" (Def.'s Opp'n Class Cert. 20.) It claims that she has been "less than candid, particularly as it pertains to her ability to speak and understand the English language, which goes to the core of her claims and renders her an inadequate class representative." (<u>Id.</u>)

The evidence cited by the School District, however, does not clearly establish that Ms. Lin is so proficient in the English language as to have interests contrary to that of the class.[10] Plaintiffs have provided sufficient evidence showing that while Plaintiff can converse in English, she cannot read in English.[11] Indeed, by all accounts, Ms. Lin is limited English proficient in terms of her ability to read written documents. While Ms. Lin may indeed be more English proficient than other class members, that fact does not affect her capability as a class representative since she maintains the same interests and incentives.[12] Dewey, 681 F.3d at 183 ("The linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class.").

As to Ms. Perez, the School District argues that her deficiency as a class representative "lies in her failure to fulfill her obligation to 'protect the interests of the class.'" (Def.'s Opp'n

---

[10] (See Def.'s Opp'n Class Cert., Ex. P (email by Anna Perng to attorney Judith Gran stating "I think Mandy speaks terrific English, but she would be comfortable if I was present for the discussion to assist. I speak conversational level Mandarin," and subsequently stating that Ms. Perng was going to "interpret" for Ms. Lin "as needed."); Id., Ex. P, at p.7 (email attaching proposed agenda for workshop directed to Asian families with special needs children; noting that "[b]ilingual parent leader Mandy Lin will serve as a facilitator" for part of the presentation, but noting that "an interpreter" would be available); Id., Ex. R (letter from the School District and signed by Ms. Lin indicating that she has "declined the services of an interpreter during face-to-face consultation meetings that occur between the parent and the special education teacher" without any indication as to Ms. Lin's English reading ability); Capitolo Dep. 63:3–71:12 (noting that although Ms. Lin did not always require an interpreter during meetings, as she was capable of understanding and communicating in English, she still benefitted from translation of the IEP documents).)

[11] (See Pls.' Reply Br., Ex. C (email from Ms. Capitolo indicating that she felt "uncomfortable" writing to Ms. Lin in English, but was willing to speak with her via telephone).)

[12] Nonetheless, I note that Ms. Lin's higher level of proficiency in the English language again reflects back on the commonality element. Where Ms. Lin might only need written translation services in order to meaningfully participate, another class member might require oral interpretation services as well. All of the proposed "common" questions in this case turn on whether the School District provides sufficient services to allow a parent to "meaningfully participate" in the special education process.

Class Cert. 21.)  It notes that Ms. Perez received documents from counsel that were translated into Spanish but never reviewed them, had no understanding of what stage of the litigation the case was in at the time of her deposition, and did not review any of the documents produced by the School District in discovery, even those that were in Spanish and were about her child.  As the responsibility of a class representative is to stay informed about the litigation, the School District posits that Ms. Perez's abdication of her responsibilities renders her an inadequate class representative.

The School District's argument sets too high a bar.  The adequacy inquiry focuses primarily on whether the class representatives have conflicts of interest with the putative class members; it does not require that the representatives possess more than "a minimal degree of knowledge necessary to meet the adequacy standard."  New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007).  "A plaintiff need not have complete knowledge of a case to be an adequate class representative.  Indeed, he may even '[display] a complete ignorance of the facts concerning the transaction that he was challenging.'"  Shamberg v. Ahlstrom, 111 F.R.D. 689, 695 (D.N.J. 1986) (quoting In re Data Access Sys. Secs. Litig., 103 F.R.D. 130, 140 (D.N.J. 1984)); see also Gwiazdowski v. Cty. of Chester, 263 F.R.D. 178, 188 (E.D. Pa. 2009) (holding that the fact that the plaintiff was not familiar with the allegations in the complaint or the relevant documents turned over by the defendant did not impact his adequacy as a class representative).

Here, Ms. Perez has the requisite minimal degree of knowledge necessary.  She understood that the primary purpose of the current lawsuit is to help non-English-speaking parents of special education children obtain documents in their native language.  (Perez Dep. 46:11–24, 52:2–15.) She also assisted her attorney by gathering documents for purposes of discovery.  (Id. at 75:3–24.)

Although she did not comprehend the nuances of the litigation, such lack of knowledge does not render her an inadequate class representative.

*b.*     *Adequacy of Counsel*

The School District also raises issues with the adequacy of counsel, noting that "[w]hile the District has no doubt that class counsel has significant experience litigating class actions, the District is nevertheless troubled by counsel's pursuit of this matter with little to no involvement of the Named Plaintiffs and notwithstanding their credibility issues." (Def.'s Opp'n Class Cert. 22) Specifically, the School District argues that two of the named Plaintiffs were not aware that a settlement conference had occurred, all of the named Plaintiffs were confused about their discovery obligations, and none were familiar with either the Amended Complaint or the interrogatory responses submitted on their behalf.

Questions concerning the adequacy of class counsel are governed by Federal Rule of Civil Procedure 23(g), which requires a court to consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g); see also Dewey, 681 F.3d at 181 n.13 (noting that adequacy of class counsel must be considered under factors in Fed. R. Civ. P. 12(g)).

The three legal organizations representing Plaintiffs—the Public Interest Law Center, the Education Law Center, and Drinker Biddle & Reath LLP—undisputedly have experience in handling class actions. The School District does not suggest, and I find no indication, that counsel lacks knowledge of the applicable law. Rather, the only question here is whether counsel is adequately devoting sufficient resources to keeping its clients apprised of the proceedings. While

counsel bears an obligation to ensure that the named Plaintiffs understand the basic nature of their claims and comply with their basic legal allegations, the isolated missteps identified by the School District do not raise any genuine concern that counsel will not adequately represent the interests of the class. Indeed, counsel has thoroughly prosecuted this litigation since 2015 by obtaining and analyzing documents obtained in discovery, taking and defending depositions, retaining experts, pursuing settlement discussions, and seeking class certification, suggesting that it has devoted sufficient resources to this matter. Accordingly, I find that the adequacy of representation factor has been satisfied.

### C. Rule 23(b)(2) Requirements

In addition to the Rule 23(a) requirements, a court must ensure that a putative class complies with one of the part of subsection (b). Baby Neal, 43 F.3d at 55–56. Rule 23(b)(2) was written with the purpose of "remedying systemic violations of basic rights of large and often amorphous classes." Id. at 64. In other words, Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2)); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997).

A Rule 23(b)(2) class must be sufficiently cohesive. Barnes v. Am. Tobacco Co., 161 F.3d 127, 143 (3d Cir. 1998) ("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive."). This cohesiveness requirement serves two interests. The first interest is in protecting unnamed class members, who "are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action." Barnes, 161 F.3d at 143. The second interest is in ensuring that the

litigation remains manageable.  If a class is not sufficiently cohesive, "the suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently."  Id. (quotation marks, citations, and alterations omitted).

For a court to find a class cohesive, it must find that the "class's claims are common ones and that adjudication of the case will not devolve into consideration of myriad individual issues." Newberg on Class Actions § 4:34. "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." Dukes, 564 U.S. at 360 (emphasis in original).  The Third Circuit has held that any "'disparate factual circumstances of class members' may prevent a class from being cohesive." Gates v. Rohm & Haas, 655 F.3d 255, 264 (3d Cir. 2011) (quoting Carter v. Butz, 479 F.2d 1084, 1089 (3d Cir. 1973)). The court has the discretion to deny certification in the presence of disparate factual circumstances. Geraghty v. U.S. Parole Comm'n, 719 F.2d 1199, 1206 (3d Cir. 1983).  Thus, "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Dukes, 564 U.S. at 360, 131 (quotations omitted).

Here, Plaintiffs must show that final injunctive or declaratory relief is appropriate for the Student and Parent Classes with respect to the provision of language-based services that will ensure meaningful participation in the special education process by limited English proficient parents of children with special needs.  Again, Plaintiffs do not allege that the School District has failed to provide *any* language-based services, but rather that it "has systematically failed to

provide *sufficient* language services." (Pl.'s Mem. Supp. Class Cert. 24 (emphasis added).) To remedy these alleged systemic deficiencies, Plaintiffs seek an order requiring the School District "to provide qualified interpreters at IEP meetings, to translate IEP plans and evaluations, and to develop and implement new District-wide policies for language services, among other injunctive and declaratory relief." (Id.)

While a Rule 23(b)(2) class action initially would seem an appropriate vehicle for this type of problem, the same deficiencies that defeat commonality also preclude a finding of cohesiveness. "The ability to fashion relief for the class as a whole is not necessarily as straightforward as Plaintiffs appear to assume." In re Processed Egg Prods. Antitrust Litig., 312 F.R.D. 124, 169 (E.D. Pa. 2015). As discussed above, the concept of "meaningful participation" is highly fact-intensive and, thus, is not conducive to issuing any one remedy that would ensure meaningful participation. For example, meaningful participation would not be satisfied by mandating interpreters during IEP conferences for parents who, like Plaintiff Ms. Lin, have sufficient grasp of the English language and choose not to have the disruption of an interpreter. Further, translation of IEP documents would not assist a parent who cannot read either in English or in his/her native language. Moreover, ordering the provision of additional "qualified" bilingual counseling assistants would be antithetical to parents who choose to rely on bilingual teachers or other staff who can serve as "qualified" translators. In addition, Plaintiff has not clarified whether the School District will have to provide these services for all potential languages and dialects for the class, or whether the services will be limited to a certain set of languages. And if certain languages and/or dialects are not included, the question arises as to whether putative class members who speak those languages would be foreclosed from pursuing their own action.

Ultimately, ordering the relief that Plaintiffs seek—that the School District "adopt and implement a new written special education plan and District policy to provide legally mandated translation and sufficient interpretation services to members of the Parent Class and the Student Class"—simply initiates a process through which highly-individualized determinations of liability and remedy are to be made. (Am. Compl., Wherefore Cl. ¶. 2.) This relief would be "class-wide in name only, and it would certainly not be final." Jamie S. v. Milwaukee Public Schs., 668 F.3d 481, 499 (7th Cir. 2012). In other words, the requested order would merely establish a system for eventually providing individualized relief. As Plaintiffs have failed to present evidence as to how a single order of injunctive relief would provide appropriate final relief to the class as a whole, I find the class inappropriate for class treatment.

### D. Conclusion as to Class Certification

"[A] class may not be certified without a finding that each Rule 23 requirement is met." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 310 (3d Cir. 2008). "Careful application of Rule 23 accords with the pivotal status of class certification in large-scale litigation, because denying or granting class certification is often the defining moment in class actions (for it may sound the 'death knell' of the litigation on the part of plaintiffs, or create unwarranted pressure to settle nonmeritorious claims on the part of defendants)." Id. (quotations omitted). Accordingly, "the potential for unwarranted settlement pressure" is a factor to be weighed in a certification analysis. Id.

Having engaged in the requisite "rigorous" analysis required for motions seeking class certification, I do not find that Plaintiffs have established all of the elements under Rule 23(a) and Rule 23(b)(2). Although Plaintiffs have proven both typicality and adequacy of representation, they have failed to demonstrate either that the numerosity element is satisfied or that there are

questions of law or fact that are common to the class.  Moreover, the IDEA's highly-individualized concept of "meaningful participation" strips the case of the cohesion necessary for ensuring that a single injunction or declaratory judgment would provide relief to each member of the putative class.

My conclusions do not touch on the merits of Plaintiffs' individual claims or the ultimate issue of whether School District denied Plaintiffs the opportunity of meaningful parental participation in the special education process.  The sole question before me is whether Plaintiffs have met their burden to establish that this case may proceed as a class action under Federal Rule of Civil Procedure 23.  I find they have not, and that this case is best pursued in more individualized fashion.  Indeed, as aptly noted by the United States District Court for the District of Columbia, "IDEA's singular focus on an individualized, cooperative educational approach providing customized remedies makes Congress's neglect of broad-based actions understandable and renders IDEA actions ill-suited to class-wide relief."  Blackman v. District of Columbia, 633 F.3d 1088, 1094 (D.D.C.  2011).   Accordingly, I must deny the Motion for Class Certification.

## V.      CONCLUSION

In light of the foregoing, I will deny the Motion for Class Certification in its entirety.  An appropriate Order follows.