**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **T.R., et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **No. 15-4782** |
| | : | |
| **SCHOOL DISTRICT OF PHILADELPHIA,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**Goldberg, J.**                                                                 **April 30, 2020**

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, who are students in the School District of Philadelphia ("School District") and their parents, have filed this putative class action lawsuit under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), 22 Pa. Code §§ 14–15, the Equal Education Opportunities Act ("EEOA"), and Title VI of the Civil Rights Act of 1964. Plaintiffs allege that the School District's provision of translation and interpretation services to limited English proficient parents is deficient such that it deprives those parents of the ability to meaningfully participate in the special education process and the development of individualized education programs ("IEP"s).

On April 18, 2020, I denied class Plaintiffs' Motion for Class Certification, leaving as plaintiffs: L.R. and D.R. (minors), their mother Madeline Perez, R.H. (a minor), and his mother Manqing Lin (collectively, "Plaintiffs").[1] The School District has moved for summary judgment on all of Plaintiffs' claims. For the following reasons, I will grant the Motion and enter judgment in favor of Defendant due to Plaintiffs' failure to exhaust administrative remedies.

---

[1] Several other named Plaintiffs have been voluntarily dismissed from this action.

# I. FACTUAL AND PROCEDURAL HISTORY

The following facts are undisputed unless otherwise noted. [2]

## A.   <u>School District Practices</u>

The IDEA, 20 U.S.C. § 1400, <u>et seq.</u>, requires that, in order to accommodate the educational needs of children with disabilities, there must be a process of written notice, parent consent, evaluation, creation and review of documents, and development of an IEP in conjunction with school staff and parents, all of which is known as the "IEP process."  The central question in here turns on the implementation of this IEP process for children with disabilities from homes with where the parents are not fluent in the English language, or limited English proficient ("LEP").

### 1.   <u>General School District Translation/Interpretation Services</u>

The School District's Office of Family and Community Engagement ("FACE") provides translation and interpretation services, as well as professional development for District staff and administrators on how to best support parents who are LEP.  The School District maintains a document management system where some documents, such as the School District's attendance and transportation policies, are translated into the eight most common languages and remain publicly available on the School District's website.  (DSUF ¶¶ 8–9; PC ¶¶ 8–9.)  Deputy Chief of FACE, Jenna Monley, testified that the School District also translates into the eight languages other documents that are sent home to parents, such as report cards and teacher letters to the class.  (Def.'s Mot. Summ. J., Ex. A, Dep. of Jenna Monley ("Monley Dep."), 78:5–81:20.)  Plaintiffs

---

[2]    References to the parties' pleadings will be made as follows:  Plaintiffs' Statement of Undisputed Facts ("PSUF"); Defendant's Statement of Undisputed Facts ("DSUF"); and Plaintiffs' Counterstatement ("PC").  To the extent a statement is undisputed by the parties, I will cite only to the parties' statements of undisputed fact.  If a statement is disputed and can be resolved by reference to the exhibits, I will cite the supporting exhibit or exhibits.  I will also cite to the supporting exhibits in the event further clarification of a fact is required.

have pointed to evidence that many general school documents are not regularly translated.  (Pls.'
Resp., Ex. 3, Decl. of Anna Perng ("Perng Decl."), ¶ 26; Pls.' Resp., Ex. 5, Decl. of Manqing Lin
("Lin Decl."), ¶ 8;  Pls.' Resp., Ex. 6, Decl. of Madeline Perez, ¶ 7.)

At the school-level, School District employees can make requests to FACE to have
documents translated and may also directly use the School District's Bilingual Counseling
Assistants ("BCAs").   (Monley Dep. 77:4–80:24.)   The School District's translation and
interpretation services are available throughout the school year and are utilized both at key
meetings (*e.g.*, IEP meetings, report card conferences) and for day-to-day communications (*e.g.*
attendance issues, permission slips).   (Def.'s Mot. Summ. J., Ex. B, Special Education
Parent/Guardian Rights; Def.'s Mot. Summ. J. Ex. C, Dep. of Ludy Soderman ("Soderman Dep."),
51:9–23, 97:17–23.)  For example, if a teacher needs to send a letter home to parents about a
particular student, and if the school's BCA knows the target language, then the BCA will translate
that letter for the teacher without involving the FACE office.  (Monley Dep. 79:21–80:23.)

Nonetheless, the School District's translation and interpretation services are not always
available because the demand for interpreters often exceeds the number of staff available.  (Pls.'
Resp., Ex. 12.)  And BCAs are not available in every school building every day.  (Soderman Dep.
173:24–174:19.)  Rather, BCAs are provided to school buildings by request and generally reserve
their time for shorter, one-page documents.  (Soderman Dep. 124:12–20, 152:4–9.)  In turn, not
all employee requests for translation are fulfilled.  (Pls.' Resp., Ex. 9, Dep. of Marie Capitolo
("Capitolo Dep."), 146:7–7.)

In addition to the BCAs, the School District uses the Language Line—a telephonic
interpretation service—as a backup option when the parent's language is not spoken by a BCA.

(Soderman Dep. 39:4–40:17.)  With telephonic interpretation, anyone in the school can call and request services.

        2.      <u>Translation/Interpretation Services for Special Education</u>

In the special education realm, the School District offers various services to LEP parents. Parents receive a copy of the Procedural Safeguards in their native language at various times throughout the special education process.  In addition, parents are given a Special Education Parental/Guardian Rights Notice, which inform them that they can request interpretation and translation services during the special education process.  This document is translated into the eight most common languages in the District and is also read aloud at IEP meetings and interpreted if necessary.  (Def.'s Mot. Summ. J., Ex. D., Decl. of Natalie Hess ("Hess Decl") ¶¶ 7–8.)

In advance of a student's IEP meeting, the School District's practice is to prepare a draft IEP in English.  Some occasions arise where the School District deviates from that practice and does not provide a draft prior to the meeting.  (Def.'s Mot. Summ. J., Ex. H, Dep. of Marie Capitolo ("Capitolo Dep."), 43:6–44:18.)  Nevertheless, the School District's protocol is to allow parents sufficient time to review the draft with both the Special Education Liaison for their child's school and one of the BCAs.  (Def.'s Mot. Summ. J., Ex E ¶ 4; Hess Decl. ¶ 9.)  Over the past year, the District has hired additional BCAs to better serve families who do not speak English.  (Hess Decl. ¶ 10.)  BCAs and other school staff are trained in practices for providing interpreter services for IEP meetings.  (Soderman Dep. 45:4–46:10.)

According to the School District's practices and procedures, and "per IDEA regulations," Notices of Recommended Placement ("NOREPs"), Procedural Safeguards, and Permissions to Re-evaluate "must be in the parents/guardians' native language, unless it is clearly not feasible to do so."  (Def.'s Mot. Summ. J., Ex. E.)  The Procedural Safeguards, as well as a Special Education

Parental/Guardian Rights Notice, are provided to parents of special education students that are initially identified and annually at IEP meetings.  (Hess Decl. ¶¶ 7–8; Def.'s Mot. Summ. J., Ex. B.)  Although the School District's practice is that students should be evaluated by a bilingual certified school psychologist, (Pls.' Opp'n,  Ex. 7, Dep. of Natalie Hess ("Hess Dep.") 184:17–185:7), oftentimes the evaluation is done by a school psychologist working alongside a translator. (Soderman Dep. 106:17–108:4; Decl. of William Del Toro Vargas ("Vargas Decl.") ¶ 14.)

Plaintiffs posit that the School District's protocols are not always followed in practice. (Perez Decl. ¶¶ 15, 34; Vargas Decl. ¶ 20.)   Plaintiffs do not dispute that these translation and interpretation services are, in many instances, provided to LEP parents, but they challenge the quantity, quality, and consistency of those services.  Plaintiffs dispute that the Special Education Parental/Guardian Rights Notice sufficiently apprises LEP parents of their right to obtain adequate translation and interpretation services, and they contend that Procedural Safeguards are often not provided to parents in their native languages.  Further, Plaintiffs cite evidence that many of the documents, such as NOREPS and Permissions to Re-evaluate, are often not translated into parents' native languages.  (PC ¶¶ 16–18, 20.)  As to the draft IEPs, Plaintiffs posit that while it may generally be the practice to prepare these draft IEPS, they are not fully translated for LEP parents, even when specifically requested, and are not provided sufficiently in advance.  (Hess Dep. 269:5–7; Lin Decl. ¶ 18.)

Plaintiffs also allege that not all staff that provide such interpretive services are specially trained since the School District will often use bilingual teachers, principals, staff secretaries, and sometimes individuals who worked outside the School District.  (Hess Dep. 46:11–47:22; Soderman Dep. 137:14–138:9; 144:3–15.)  Ludy Soderman, Director of Multilingual Family Support at the School District, explained that there were no specific policies, standards, or

protocols in place with regard to how BCAs provide interpretation services in the special education context.  (Soderman Dep. 105:18–106:6.)

Director of Special Education Marie Capitolo acknowledged that "meaningful participation" by a parent entails not only the parent's awareness of the IEP meeting, but also the parent's ability to comment on their availability, ask questions and make comments, provide possible revisions to the IEP, provide information on their child's level of function, know that they have the right to not consent to permissions to evaluation, and recommend educational placements.  (Capitolo Dep. 41:18–42:8.)   The School District attempts to follow these best practices, and special education staff receives some training on how to encourage parental participation.  (Hess Dep. 35:6–21, 133:7–23,165:12–168:2.)   Plaintiffs assert, however, that the failure to translate many IEP documents may inhibit the ability of LEP parents to participate.  (Soderman Dep. 169:1– 170:4; Pls.' Response, Ex. 21, Dep. of Madeline Perez ("Perez Dep."), 103:3–12.)

### B.   Undisputed Facts Regarding Plaintiff Lin and her Child R.H.

At the time relevant to the Amended Complaint, R.H. was a kindergarten student at an elementary school in the School District.  In 2014, R.H. underwent several evaluations and was ultimately diagnosed with Autism Spectrum Disorder.  In a 2015 evaluation, R.H. was found to be mentally gifted, with a score placing R.H. in the 99.9% superior range for aptitude in math and at the age equivalent of nine-year old.  R.H.'s mother, Manqing Lin, can understand and speak some English words, but speaks primarily Mandarin.   She has repeatedly sought translation and interpretation services from the School District.  (Am. Compl. ¶¶ 97–02.)

Plaintiff Lin has had the opportunity to meet with School District staff that provide R.H.'s services and she frequently communicates with members of R.H.'s IEP team about his progress.  (Def.'s Mot. Summ. J., Ex. I, Dep. of Manqing Lin ("Lin Dep."), 41:9–44:19; Capitolo Dep.

74:24–77:19.)  Although these meetings contribute to her ability to understand and participate in R.H.'s educational services, she cannot always understand the services being offered in his IEP due to language barriers.  (Lin Decl. ¶¶ 16–58.)

Ms. Capitolo testified that Ms. Lin has regularly come to IEP meetings and, with the assistance of translation, participated in the meetings, providing input and suggested revisions, asking questions, and sharing her child's experiences.  Ms. Capitolo found her to be "more prepared than 99 percent of [her] parents are."  (Capitolo Dep. 68:8–69:17–18.)  Ms. Lin, however, believed her ability to participate to be hampered by the fact that many of the IEP-related documents were not translated into Chinese.  (Lin Dep. 142:6–24, 162:5–21.)

Although Plaintiff Lin and R.H. did not raise their claims or concerns to an administrative hearing officer, Ms. Lin requested and received mediation through the Office of Dispute Resolution, resulting in a mediation agreement between Ms. Lin and the District.  (DSUF ¶¶ 26–27; PC ¶¶ 26–27.)  The mediation agreement, dated August 18, 2016, related specifically to Ms. Lin's request for an independent educational evaluation ("IEE") of her child and her request to receive translated documents related to that IEE.  (Def.'s Mot. Summ. J., Ex. J.)  In connection with her mediation agreement, the School District has provided Ms. Lin with access to a BCA and the school's Special Education Liaison to review draft documents in advance of meetings.  (Def.'s Mot. Summ. J., Ex. K, Aff. of Manqing Lin ("Lin Aff.") ¶¶ 7–10; Capitolo Dep. 66:4–69:18, 74:7–75:22.)  Ms. Lin testified, however, that even with those services, she has been unable to fully understand the contents of the reports because the interpreter did not understand all the terminology within them.  (Lin Dep. 50:1–53:17, 142:12–143:21.)

Ms. Lin is not currently seeking individualized damages or remedies of any kind based on R.H.'s placement or education services.  Rather, Ms. Lin is seeking declaratory and injunctive

relief requiring changes to the policies, practices, and procedures of the School District with respect to its general provision of language services so that she may meaningfully participate in the development of her child's IEP plans.  (DSUF ¶ 28; PC ¶ 28.)

### C.    Facts Regarding Plaintiff Perez and Her Children D.R. and L.R.

Plaintiffs L.R. and D.R. attended school in Puerto Rico until they moved to Philadelphia in 2012.  They received special education services and had IEPs in Puerto Rico when they enrolled in the Philadelphia School District.  L.R. has attention deficit hyperactivity disorder ("ADHD"), having been originally evaluated and diagnosed with autism in 2012 by the Center for Autism. D.R. has been diagnosed with oppositional defiance disorder ("ODD") and ADHD.  Their mother, Madeline Perez, is LEP and speaks primarily Spanish.  (Am. Compl. ¶¶ 87–91.)

Acting through an interpreter, Ms. Perez has been able to provide input to the School District in "every evaluation" for her children, including their medication, their behavior at home, and the type of doctors they see.  (Perez Dep. 83:15–88:24.)  Ms. Perez has collaborated with the School District and she often receives translated documents.  (DSUF ¶¶ 41–42; PC ¶¶ 41–42.)  She is generally satisfied with the services provided for her children.  (Perez Dep. 101:19–24.)

The language, however, has remained a barrier.  For example, when her child L.R. was evaluated by the School District in 2012, the evaluation report was provided in English only and as a result, Ms. Perez, did not realize that L.R.'s diagnosis of autism was not included in his IEP. Since the School District placed her son at the Devereaux School, Ms. Perez has not received any special education documents translated into Spanish.  She believes that because she does not receive any documents in Spanish, she does not know the services that L.R. receives at school or whether he is making progress.  (Perez Decl. ¶¶ 18, 10–18.)

Ms. Perez also has not raised any of her claims to an administrative hearing officer, but has previously, through counsel, raised issues to the School District regarding her children's special education services.  Rather, like Ms. Lin, Ms. Perez seeks only declaratory and injunctive relief requiring changes to the policies, practices, and procedures of the School District with respect to its general provision of language services.  (DSUF ¶¶ 36–37; PC ¶¶ 36–37.)

### D.   Procedural History

On August 21, 2015, former Plaintiffs T.R. and A.G., with their parents Barbara Galarza and Margarita Peralta, filed this lawsuit.  On April 10, 2017, those former Plaintiffs, together with current Plaintiffs—Manqing Lin and her child R.H., and Madeline Perez, and her children L.R., D.R., and J.R.—filed the First Amended Complaint.  Count One alleges a violation of the Individuals with Disabilities Education Act ("IDEA") for failure to provide meaningful parental and student participation.  Count Two sets forth a violation of IDEA for failure to conduct evaluations of students in their native language.  Count Three asserts a violation of Section 504 of the Rehabilitation Act, Americans With Disabilities Act as amended, and 22 Pa. Code Chapter 15.  Count Four pleads a claim for violation of the Equal Education Opportunity Act.  Count Five alleges a violation of Title VI of the Civil Rights Act of 1964.  Count Six sets forth a violation of 22 Pa. Code Chap. 14.  Finally, Count Seven sets forth a violation of 22 Pa. Code Chap. 15.

On October 18, 2017, the parties filed a stipulation to dismiss with prejudice the claims of A.G. and his guardian, Margarita Peralta, which I signed on October 19, 2017.  On August 3, 2018, T.R. and Ms. Galarza filed a stipulation to voluntarily dismiss with prejudice their claims against the School District, which I signed on August 8, 2018.

On August 3, 2018, Plaintiffs filed a motion for class certification on behalf of a class of students and a class of parents.  I denied that motion on April 18, 2019, leaving only the remaining

named Plaintiffs.  The parties then filed a stipulation to dismiss with prejudice the claims of J.R., which I signed on September 30, 2019.  The School District now seeks summary judgment as to all remaining claims.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III. DISCUSSION

### A. IDEA Claims

The crucial question in this case centers on the statutory mandate within the IDEA that a school provide sufficient language services to allow for "meaningful participation" by parents in the education of their special needs students.

The purpose of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A). Under the IDEA, a State is eligible for federal funding if it complies with several requirements, all aimed at protecting the rights of students with disabilities and their parents. The main requirement is that States make available a free appropriate public education, or "FAPE". Id. § 1412(a)(1).

The IDEA recognizes the importance—and, indeed the necessity—of parental participation in both the development of an IEP and any subsequent assessment of its effectiveness. Honig v. Doe, 484 U.S. 305, 311 (1988). Thus, the IDEA "establishes various procedural safeguards which guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education, and the right to seek review of decisions they believe are inappropriate." Colonial Sch. Dist. v. G.K. by and through A.K., No. 17-3377, 2018 WL 2010915, at *12 (E.D. Pa. Apr. 30, 2018), aff'd, 763 F. App'x 192 (3d Cir. 2019). "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." Bd. of Educ. v. Rowley, 458 U.S. 176, 205–06 (1982). As stated by the United States Supreme Court:

> These safeguards include the right to examine all relevant records
> pertaining to the identification, evaluation, and educational

11

> placement of their child; prior written notice whenever the responsible educational agency proposes (or refuses) to change the child's placement or program; an opportunity to present complaints concerning any aspect of the local agency's provision of a free appropriate public education; and an opportunity for "an impartial due process hearing" with respect to any such complaints.

Honig, 484 U.S. at 312.

Plaintiffs here originally sought widespread injunctive relief, on behalf of two classes, for an alleged systemic failure by the School District to facilitate "meaningful participation" for LEP parents in the special education process. Class certification having been denied, the sole remaining issues are whether named Plaintiffs Manqing Lin, on behalf of her child R.H., and Madeline Perez, on behalf of her children D.R. and L.R., have been denied the right to meaningfully participate in the IEP process as required by IDEA. [3]

The School District now seeks summary judgment as to these remaining IDEA claims on several grounds. First, it contends that because Plaintiffs admit that they have not raised their claims to an administrative hearing officer and have not been through a due process hearing, this Court does not have subject matter jurisdiction and all of Plaintiffs' claims should be dismissed. Second, it asserts that Plaintiffs lack standing to pursue their claims. Finally, the School District posits that Plaintiff parents fail to state a claim that they did not meaningfully participate in their children's IEP process.

As I find that I lack subject-matter jurisdiction over the IDEA claims due to Plaintiffs' failure to exhaust administrative remedies, I focus solely on that argument.

---

[3]     In Count II of the Complaint, Plaintiffs originally brought a separate IDEA claim on behalf of the Student Plaintiffs alleging that they were denied timely evaluations for special education services in their native language. Plaintiffs concede, however, that none of the remaining Student Plaintiffs have been denied a timely bilingual evaluation, and they request dismissal of these claims. (Pls.' Opp'n Summ. J. 19 n.15.) Given this concession, I will dismiss these claims with prejudice and will not further discuss any related claims in this Memorandum Opinion.

1.      General Overview of the IDEA and the Exhaustion Requirement

Under the IDEA, States must comply with detailed procedures for identifying, evaluating, and making placements for students with disabilities, as well as procedures for developing individualized education plans or IEPs.   Batchelor v. Rose Tree Media Sch. Dist., 759 F.3d 266, 271–72 (3d Cir. 2014).  States must also "implement specified procedural safeguards to ensure children with disabilities and their parents are provided with due process."  Id. at 272.  "These safeguards, known collectively as the IDEA's administrative process, provide parents with an avenue to file a complaint and to participate in an impartial due process hearing with respect to 'any matter relating to the identification, evaluation, or educational placement of the[ir] child, or the provision of a free appropriate public education to such child . . . .'"  Id. (quoting 20 U.S.C. §§ 1415(b)(6)(A), 1415(f)(1)(A) (parents who have filed a complaint "shall have an opportunity for an impartial due process hearing . . . .").

As a general rule, exhaustion of the administrative process is required in order for the statute to "grant[] subject matter jurisdiction to the district court []" for judicial review.  Komninos v. Upper Saddle River Bd. of Ed., 13 F.3d 775, 778 (3d Cir. 1994).  Once exhaustion is completed, a federal district court is authorized to grant "such relief as [it] determines is appropriate" based on the preponderance of the evidence, 20 U.S.C. § 1415(i)(2)(c)(i)–(iii), including "attorneys' fees, reimbursement for a private educational placement, and compensatory education."  Chambers v. Sch. Dist. of Phila. Bd. of Ed., 587 F.3d 176, 185 (3d Cir. 2009) (internal quotation marks omitted).

2.      Whether Plaintiffs Were Required to Exhaust Administrative Remedies

Defendant contends that Plaintiffs have failed to exhaust administrative remedies as to any of their IDEA claims and, as such, the Court lacks subject-matter jurisdiction over those claims. Plaintiffs respond that their Amended Complaint alleges and seeks relief for systemic and

pervasive failures in the School District's special education system.  As the administrative process has no ability to remedy such systemic failures, the administrative exhaustion is futile and should therefore be excused.

In the IDEA context, the United States Court of Appeals for the Third Circuit has held that plaintiffs need not exhaust the administrative process when: (1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; or (4) exhaustion would cause severe or irreparable harm upon a litigant.  M.M. v. Paterson Bd. of Educ., 736 F. App'x 317, 320 (3d Cir. 2018) (quoting D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 275 (3d Cir. 2014)).  Under the futility and no-administrative relief exceptions—the only two exceptions at issue here—plaintiffs may be excused from administrative exhaustion in the IDEA context when they "'allege systemic legal deficiencies and, correspondingly, request system-wide relief that cannot be provided (or even addressed) through the administrative process.'"  J.T. v. Dumont Pub. Schs., 533 F. App'x. 44, 54 (3d Cir. 2013) (quoting Beth V. by Yvonne V. v. Carroll, 87 F.3d 80, 89 (3d Cir. 1996)).

A claim addresses systemic legal deficiencies "'if it implicates the integrity or reliability of the IDEA dispute resolution procedures themselves, or requires restructuring the education system itself in order to comply with the dictates of the [IDEA].'"  J.T. v. Dumont Pub. Schs., 533 F. App'x. 44, 54 (3d Cir. 2013) (quoting Doe  by and through Brockhuis v. Ariz. Dep't of Educ., 111 F.3d 678, 682 (9th Cir. 1997)).  A claim does not implicate systemic deficiencies "'if it involves only a substantive claim having to do with limited components of a program, and if the administrative process is capable of correcting the problem.'"  Id. (quoting Brockhuis, 111 F.3d at 682).  In other words, to fall under the "systemic" exception, the alleged violations must be "truly systemic . . . in the sense that the IDEA's basic goals are threatened on a systemwide basis."  Hoeft

v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1305 (9th Cir. 1992).  "Suits labeled 'systemic' . . . tend to 'challenge[] policies or practices,' or administrative failures, 'at the highest administrative level.'"  Parent/Professional Advocacy League v. City of Springfield, Mass., 934 F.3d 13, 27–28 (1st Cir. 2019) (quoting Hoeft, 967 F.2d at 1305)).

Repeatedly, courts facing putative class actions claiming a systemic deficiency under IDEA have found that the commonality requirement of Fed. Rule Civ. P. 23(a) and the systemic exception to the exhaustion requirement often go hand in hand.  Where commonality regarding the alleged deficiency is lacking among the putative class, courts have found no real systemic denial and, thus, have declined to excuse exhaustion.

For example, in Parent/Professional Advocacy League v. City of Springfield, Mass., the United States Court of Appeals for the First Circuit addressed a putative class action seeking injunctive and declaratory relief, including an order that the defendant school district provide the class plaintiffs—students with a mental health disability—with "school-based behavior services in neighborhood schools to afford them an equal education opportunity and enable them to be educated in neighborhood schools."  Id. at 17–18.  The district court declined to certify a class, finding, in part, that commonality had not been satisfied.  Id. at 22–23.  Faced with a subsequent motion for judgment on the pleadings, the district court held that the named plaintiffs had failed to exhaust administrative remedies and that no exception relieved them of their obligation to exhaust. Id. at 23.

On appeal of both rulings, the First Circuit acknowledged the well-recognized exception to the IDEA's exhaustion rule for "systemic" suits but found that "[t]he plaintiffs' claims are not 'systemic' in the sense contemplated by any such exception."  Id. at 27.  The Court concurred with the district court that commonality under Fed. R. Civ. P. 23(a)(2) did not exist because there was

no uniform policy enforced at the highest administrative level that governed the placements and services of students with behavioral disabilities.  Id. at 30.  Consistent with that ruling, it held that the plaintiffs' claims required highly-individualized determinations: "[a] finding that one student with a certain type and degree of mental health disability should have been mainstreamed would not mean that another student with a different type, or even just a different degree, of mental disability should have received the same services or been mainstreamed." Id. at 27–28.  Given the absence of a common question giving rise to a claim for systemic relief, the systemic exception to the IDEA exhaustion requirement could not apply. Id. at 28.

The United States Court of Appeals for the Ninth Circuit confronted a similar situation in Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298 (9th Cir. 1992).  In that matter, the parents of four disabled children sought declaratory and injunctive relief against the school district on behalf of themselves and a class of similarly-situated children.  They alleged that the school district had formal written policies and informal *de facto* policies concerning extended school year services that operated to deny children with disabilities an appropriate, individually-tailored education in violation of the IDEA.  Id. at 1299.  The Ninth Circuit framed the issue before it as whether the parents had to exhaust administrative remedies when mounting a class action challenge to these policies, as opposed to challenging their children's IEPs formulated pursuant to these policies.  Id. at 1299–1300.  The plaintiffs argued that exhaustion was both futile and inadequate where they sought structural, systemic reforms. Id. at 1304.

The Ninth Circuit rejected the notion that the class action nature of the suit entitled the plaintiffs to bypass IDEA's administrative procedures, noting that "[a]dministrative remedies are not inadequate simply because a large class of plaintiffs is involved." Id. at 1309.  Moreover, the Court remarked that "the mere unavailability of injunctive relief does not render the IDEA's

administrative process inadequate.  Rather, the relevant inquiry is whether the administrative process is adequately equipped to address and resolve the issues presented."  Id.  Given those principles, the Court found that the allegations of the complaint did not rise to truly systemic proportions since the IDEA's basic goals were not threatened on a system-wide basis; rather the complaint focused on a particular component of the school district's special education program. Id.  As the issues in that case consisted primarily of questions of substantive educational policy— issues which the administrative process was specifically designed to address—the administrative process had the potential for producing the very result plaintiffs sought, "namely, statutory compliance."  Id.  Ultimately, the court affirmed dismissal of the class action suit, concluding that until the four named plaintiffs first sought and had been denied administrative relief, the court was "ill-equipped to ascertain whether [the school district's] policies operate to deny individual disabled students the education guaranteed them by the IDEA."  Id. at 1310.  Moreover, it held that "pursuit of the administrative process affords the plaintiffs not only a means of obtaining the administrative reform sought in their prayer for relief, but also an opportunity to secure the individual redress which motivates their claims."  Id.

Likewise, in D.C. v. Pittsburgh Public Schools, 415 F. Supp. 3d 636 (W.D. Pa. 2019), the United States District Court for the Western District of Pennsylvania confronted the operation of the systemic exception in the context of a putative IDEA class action.  Plaintiff alleged that he and his class members "were denied appropriate behavioral support services," and that "[t]his lack of appropriate support ultimately resulted in the District's reliance on school police and inappropriate discipline in response to behaviors that were a clear manifestation of [plaintiff's] and the Class Members' disabilities."  Id. at 651.  The defendant moved to dismiss because the class members failed to exhaust administrative remedies, and plaintiff responded that the case fell within the

"systemic" exception.  Id. at 651.  The court found that no such systemic relief was available because "just as deviations from mainstream education for students with disabilities . . . must be determined on an individualized basis, such exceptions from the disciplinary policy also must be determined on an individualized basis."  Id. at 651–52.  The court concluded that "[b]ecause this relief must be sought on a case-by-case basis through the administrative process, and because [the plaintiff] [did] not allege that a systemic deficiency caused the District's alleged failure to properly identify and support [plaintiff] and similarly situated students, [plaintiff] ha[d] not adequately pleaded a basis for the putative class to be excused from the IDEA'S administrative exhaustion requirement."  Id. at 652.  As the plaintiff had not exhausted, the court dismissed the class claims based on lack of subject matter jurisdiction.  Id. at 652.

Finally, in S.S. by S.Y. v. City of Springfield, Mass., the plaintiffs brought a proposed class action on behalf of all students who had been diagnosed with mental health disabilities and enrolled not in a "neighborhood school," but "segregated" into one of several other schools operated by the defendant school district.  318 F.R.D. 210, 213–14 (D. Mass. 2016), aff'd 934 F.3d 13 (1st Cir. 2019).  The plaintiffs asserted that the school district's systemic denial of school-based behavior services was a violation of the IDEA and the ADA, and "therefore, an order requiring [defendant] to provide [such services] at all neighborhood schools would resolve the case for all class members."  Id. at 223.  The court did not find this allegation persuasive, noting that the putative class had not established the commonality element for class certification because it relied on a faulty assumption that the implementation of such school-based behavior services would "benefit all members of proposed class regardless of the specific histories, diagnoses, and behaviors of individual class members."  Id.  In turn, the court recognized that IDEA exhaustion was required for plaintiffs to proceed with their claims.  Id. at 222.

This case presents a similar situation to the aforementioned cases.  At the motion to dismiss stage, the School District originally alleged that I lacked subject matter jurisdiction over the putative class members because neither the named plaintiffs nor any of the putative class members had exhausted administrative remedies.  T.R. v. Sch. Dist. of Philadelphia, 223 F. Supp.3d 321, 328 (E.D. Pa. 2016).  Reading the complaint in the light most favorable to the Plaintiffs, I found that Plaintiffs had plausibly alleged a systemic legal deficiency in the timely and complete translation of IEP documents, which interfered with both the ability of LEP students with disabilities to receive a FAPE and the ability of LEP parents to meaningfully participate in the planning and decision-making embodied in the IEP.  Id. at 330.  I remarked that even if the School District was ultimately correct that the decision as to which documents to translate must be made on a case-by-case basis, nothing in the Complaint—the facts of which I accepted as true— suggested that the School District was making such individualized determinations.  Id.  In doing so, however, I stressed that the case was only at the pleading stage and noted that "[i]t is certainly possible that a developed record may not establish Plaintiffs' systemic legal deficiency theory." Id.

Following extensive discovery and briefing during the class certification stage, that systemic legal deficiency theory did not bear out.  In my class certification analysis, I declined to certify a class based, in large part, on the absence of any systemic violation by the School District, common to the class members, regarding the provision of translation and interpretation services in the IEP process.  A recitation of that discussion, while perhaps lengthy, is instructive on the issue now before me:

> Here, Plaintiffs do not allege that the School District failed to provide *any* interpretation or translation services. Indeed, the evidence demonstrates that parents of special education students are provided with a Procedural Safeguards Notice, translated into eight

common languages, that specifically details the parents' "[r]ight to enlist the District's interpretation and/or translation services," including BCAs (bilingual counseling assistants), and may seek additional remedies if they believe the services provided "do not permit [the] meaningful participation in the IEP process." . . . Anyone can request a BCA from the website through the special education liaison prior to an IEP meeting. . . . The School District also has a telephone-based "Language Line" to provide interpretation services to parents. . . .

Multiple witnesses also testified at deposition that the School District did provide some interpretation/translation services. Named Plaintiff Lin acknowledged that prior to one of her IEP meetings, an interpreter was provided by the School District to review her child's reevaluation report, and a copy of the initial Independent Evaluation Report was provided to her in Chinese. . . . Prior to any meeting she attended, Ms. Lin was offered interpretation services, but there were some instances where she declined those services. . . . For named Plaintiff Perez, the School District had a BCA present at her meeting, but she elected to bring her own two interpreters and did not ask for the IEP documents to be translated into Spanish before, during, or after the meeting. . . . Former named Plaintiff Ms. Galarza chose to have her child's teacher act as an interpreter at the meeting and felt as though she was able to understand the proceedings. . . .

Thus, the question is not whether the School District must provide language-based services, but rather whether the interpretation and translation services already provided by the School District were or continue to be adequate to ensure the "meaningful participation" of the parents in the Parent Class and the parents of the students in the Student Class. As the above differing circumstances demonstrate, there is no commonality among Plaintiffs. This is because there are varying circumstances that could affect whether the particular services provided by the School District were enough or were insufficient to satisfy the right of meaningful participation. Plaintiffs appear to acknowledge this reality in the framing of their "common questions." They ask whether the School District's interpretation and translation policies are "sufficient," whether the District's notices are "effective," and whether the language services provided are "effective."

Moreover, the class questions Plaintiffs raise do not challenge a centralized policy enforced by a single decision-maker, but rather target individualized decisions by various case supervisors, school principals, and teachers as to what services are required in each particular case. The evidence of record reflects that the School

District provides significant discretion to the relevant child-study personnel—consistent with the regulations which require use of interpreters or other action, "as appropriate"—to engage parents and provide appropriate language services. <u>See</u> 34 C.F.R. § 300.322. As special education teacher Marie Capitolo testified, "Every parent comes with a totally different set of circumstances. . . . Every parent's ability to participate is different.  Some parents, I would not provide the documents translated because they can't read.  Some parents don't have information overload from one meeting, so I wouldn't have to have multiple meetings for them." . . . She went on to note that although she would definitely have an interpreter for a non-English-speaking parent, she may not have an interpreter for limited English proficient parents who are fluent enough conversationally to allow a back-and-forth with the school without interruption. . . . Thus, discretion is necessary to ensure that limited English proficient parents are given the tools they need to participate without, for example, taking the unnecessary steps of translating documents for parents who are unable to read proficiently or for whom written translation of a complex document would be overwhelming. . . .

 In light of the foregoing, I find this case . . . does not challenge broad-based, systemic failures or policies by the School District.  Rather, it challenges how specific applications of that policy affect each member individually.  Put another way, while the School District's provision of translation or interpretation services might, in some cases, deny a parent the right of meaningful participation, that same conduct may, in other cases, sufficiently allow a parent to meaningfully participate in their child's IEP process.  The decision as to which language-based services to provide is decentralized and varies from parent-to-parent and school-to-school, making the remedy not appropriate for class resolution. . . .

<u>T.R. v. Sch. Dist. of Phila.</u>, No. 15-4782, 2019 WL 1745737, at *16–17 (E.D. Pa. Apr. 18, 2019).

That analysis now implicates the exhaustion issue.  The claims presently before me—which are brought on behalf of only the named Plaintiffs—can only seek relief for the two parent Plaintiffs and their children.  And because Plaintiffs do not dispute that the School District provides many different translation and interpretation services to the parents, a wholesale change to the policy is not needed.  (<u>See</u> PC ¶ 16.)  Rather, like the cases discussed above, "Plaintiffs dispute the adequacy of the quantity, quality, and consistency of those services."  (<u>Id.</u>)  In other words,

notwithstanding Plaintiffs' efforts to package their allegations as systemic, their claims actually focus on the shortcomings of a particular component of the School District's translation/interpretation services. The claims do not rise to a truly systemic level in the sense that IDEA's basic goals are threatened on a system-wide basis. Even if improved services could, in theory, provide a universally positive outcome, the diversity of circumstances among the LEP parents and children create unique challenges that will have to be addressed on an individualized level. Because this relief must be sought on a case-by-case basis through the administrative process, and because Plaintiffs do not allege that a systemic deficiency in the School District's translation and interpretation services was the cause for any consistent IDEA violation, Plaintiffs may not be excused from the IDEA's administrative exhaustion requirement.

Plaintiffs' effort to avoid dismissal for lack of exhaustion is three-fold. First, they posit that my prior ruling on the motion to dismiss, excusing exhaustion of administrative remedies under the futility exception, is the law of the case. Second, they assert that my denial of class certification does not negate the fact that claims alleging systemic and pervasive failures in a special education program can satisfy the finality exception even when not brought as part of a class action. Finally, Plaintiffs urge that exhaustion of administrative remedies would not serve the policy rationale for the IDEA's exhaustion requirement. None of these arguments persuade me that the remaining Plaintiffs may bypass the administrative process.

First, Plaintiffs' law-of-the-case argument rests on a "critical misapplication of the fundamental distinction between a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56." Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 330 (3d Cir. 2016). Generally, "[u]nder the law of the case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages of the same case.'" Am.

Civil Liberties Union v. Mukasey, 534 F.3d 181, 187 (3d Cir. 2008) (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988)) (further citations omitted).  However, while at the motion-to-dismiss stage, a court must accept allegations of a plaintiff's complaint as true, "summary judgment is essentially 'put up or shut up' time for the nonmoving party" who "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Harmon v. Sussex Cty., No. 19-3263, 2020 WL 1696879, at *2 (3d Cir. Apr. 8, 2020) (quoting Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006)).  To that end, the law of the case doctrine does not preclude "a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations."  Maraschiello v. City of Buffalo Police Dept., 709 F.3d 87, 97 (2d Cir. 2013); see also Park v. Veasie, 09-2177, 2013 WL 1149241, at *2 (M.D. Pa. Mar. 19, 2013) ("Plaintiffs' insistence that the law of the case doctrine binds this Court to follow [the motion to dismiss] opinion would require that all opinions denying motions for dismissal must, in effect, require the Court to hold similarly in a later summary judgment motion after the Court has had the benefit of discovery. . . . Such an assertion has no support in precedent, reason or logic.").

These principles are particularly applicable here.  During consideration of Defendant's motion to dismiss based on Plaintiff's failure to exhaust administrative remedies, I found—taking the well-pled factual allegations of the Complaint as true—that Plaintiffs had alleged a systemic legal deficiency in the timely and complete translation of IEP documents, which deficiency affected LEP parents' ability to meaningfully participate in their children's IEPs.  Notably, however, I remarked that "[i]t is certainly possible that a developed record may not establish Plaintiffs' systemic legal deficiency theory."  T.R., 223 F. Supp.3d at 330.  As stated above, the evidence adduced during discovery has not borne out Plaintiffs' theory of a systemic violation.

Quite to the contrary, the evidence has revealed that any deficiencies in the School District's translation/interpretation services in the special education context require individualized resolution. The law of the case doctrine certainly does not compel me to disregard this evidence in favor of a ruling originally based on no evidence at all.

Plaintiffs' second argument asserts that claims alleging systemic and pervasive failures in a special education program can satisfy the futility exception even when they are not brought as part of a class action. (See Pls.' Resp. Opp'n Summ. J. 13 (citing C.L. v. Hastings-on-Hudson Union Free Sch. Dist., No. 14-4422, 2015 WL 1840507, at *4–5 (S.D.N.Y. Apr. 21, 2015) (declining to grant Rule 12(b)(1) dismissal—based on failure to exhaust administrative remedies— of an action brought by seven individual plaintiffs because the allegations of the complaint, taken as true, set forth a facially-plausible inference that "systemic, pervasive failures have manifested within the District's special education program"); J.S. ex rel. N.S. v. Attica Central Schs., 386 F.3d 107, 115 (2d Cir. 2004) (declining to dismiss putative class action complaint for failure to exhaust administrative remedies where complaint set forth plausible allegations of systemic problems in the school district's preparation and implementation of IEPs); D.L. v. District of Columbia, 450 F. Supp. 2d 11, 18 (D.C. Cir. 2006) (rejecting a challenge under Rule 12(b)(1) to a putative class action because complaint alleged systemic failures in compliance with Child Find requirements, which would permit exhaustion of administrative remedies to be excused).)

Plaintiffs' argument misses the point. All the above cases excused exhaustion during the motion to dismiss stage when the complaints—like the one here—set forth a plausible allegation of a systemic violation of the IDEA. By contrast, this case has proceeded through discovery, giving me the benefit of a fully developed record. My refusal to excuse exhaustion under the systemic exception is not based simply on the prior denial of class certification, but rather on the

finding—both during class certification proceedings and here—that any purported violations of IDEA are not systemic in nature.  As discussed in detail above, Plaintiffs do not dispute that the School District provides some translation and interpretation services to LEP parents in the special education realm.  (PC ¶¶ 16, 18, 19, 20, 23.)  Indeed, Plaintiffs admit that they have personally received many of these services.  (PC ¶¶ 18, 23, 33, 42.)  Plaintiffs' major dispute is whether those services are provided in all cases and to an extent sufficient to enable the LEP parent to "meaningfully participate" in the IEP process.  As such, and regardless of whether the case is proceeding as a class action, Plaintiffs have failed to provide any evidence of a systemic deficiency which would excuse exhaustion.

Plaintiffs' last effort to avoid judgment on their claims for failure to exhaust contends that "requiring Plaintiffs to exhaust administrative remedies would not serve the policy rationale for the IDEA's exhaustion requirement."  (Pls.' Opp'n Summ. J. 13.)  They posit that there is no need for further development of the administrative record, as it has already been developed through the discovery process here.  Moreover, they urge that agency expertise is not required to resolve Plaintiffs' claims of systemic deficiencies in language services.

I disagree.  The administrative process "offers an opportunity for state and local agencies to exercise discretion and expertise in fields in which they have substantial experience.  These proceedings thus carry out congressional intent and provide a means to develop a complete factual record."  Komninos by Komninos v. Upper Saddle River Bd. of Educ., 13 F.3d 775, 779 (3d Cir. 1994).  The process "encourages consistency and procedural efficiency."  Vicky M. v. Ne. Educ. Intermediate Unit 19, 486 F. Supp.2d 437, 4353 (M.D. Pa. 2007); see also Jamie S. v. Milwaukee Bd. of Sch. Directors, No. 01-928, 2012 WL 3600231, at *2 (E.D. Wisc. Aug. 20, 2012) ("Exhaustion advances several objectives, including: (1) permitting the exercise of agency

discretion and expertise on issues requiring these characteristics; (2) allowing the full development of technical issues and a factual record prior to court review; (3) preventing deliberate disregard and circumvention of agency procedures established by Congress; and (4) avoiding unnecessary judicial decisions by giving the agency the first opportunity to correct any error.").

Requiring use of the administrative process here will serve these goals.  The two Parent Plaintiffs allege that the inadequate interpretation and translation services provided by the School District have deprived them of their ability to meaningfully participate in the special education process, which, in turn, has resulted in a denial of educational opportunities.  They concede that some services for LEP individuals are available and have been provided, but contend that, in their cases, such services have not been adequate to ensure their right of meaningful participation.  They do not seek money damages, but rather only injunctive relief.  I do not possess the same expertise and familiarity with the special education system as the administrative hearing officers to fashion the injunctive relief necessary to remedy any deficiencies.  Accordingly, I find that the policies and goals of administrative exhaustion weigh heavily in favor of requiring Plaintiffs to pursue their administrative remedies.

Contrary to Plaintiffs' goals at the outset of this litigation, this case is no longer about effectuating mass change within the Philadelphia School District.  Rather, it is focused on ensuring that the two Parent Plaintiffs receive the tools to which they are entitled in order to meaningfully participate in the special education process for their children.  That goal is best served through Plaintiffs first availing themselves of the administrative system.  As I find that administrative exhaustion is required, but has not been satisfied, I lack subject-matter jurisdiction and will grant judgment in favor of the School District on the IDEA claims.

B.   **Remaining Claims Under Section 504 of the Rehabilitation Act, the Equal Education Opportunity Act, Title VI the Americans with Disabilities Act, and Pennsylvania State Law**

Aside from the IDEA claims, Plaintiff also bring claims under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, 22 Pa. Code Chapter 15, the Equal Education Opportunity Act, Title VI, and 20 Pa. Code Chapter 14.   The School District contends that each of these claims concerns the School District's alleged failure to provide translation and interpretation services during the IEP process and, thus, all of them are subject to the IDEA's exhaustion requirement.   I agree and find that these claims must also be dismissed for failure to exhaust administrative remedies.

"Exhaustion of the IDEA's administrative process is . . . required in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA."   Batchelor v. Rose Tree Media Sch. Dist., 759 F.3d 266, 272 (3d Cir. 2014); see also Wellman v. Butler Area Sch. Dist., 877 F.3d 125, 131 (3d Cir. 2017).   The statute specifically states that:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, Title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the [IDEA administrative process] shall be exhausted to the same extent as would be required had the action been brought under this subchapter.*

20 U.S.C. § 1415(l) (emphasis added).   In other words, "[t]his provision bars plaintiffs from circumventing [the] IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute—*e.g.*, section 1983, section 504 of the Rehabilitation Act, or the ADA."   Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 281 (3d Cir. 1996).

In the recent case of <u>Fry v. Napoleon Community Schools</u>, 137 S. Ct. 743 (2017), the United States Supreme Court interpreted § 1415(l) to require exhaustion if "the substance, or gravamen, of the plaintiff's complaint" seeks relief for the denial of a free appropriate public education or "FAPE." <u>Id.</u> at 752, 755. "[E]xhaustion is not necessary when the gravamen of the plaintiff's suit something other than the denial of [a FAPE]." <u>Id.</u> at 748. To assist courts in making this determination, the Supreme Court explained that the IDEA's exhaustion requirement applies if two conditions exist: (1) the plaintiff could not have brought the same claim if the alleged conduct occurred at a public facility that was not a school, and (2) an adult or non-student visiting the school could not have advanced the same claim. <u>Id.</u> at 756–57. Another clue, according to the Supreme Court, would be that the parents began to exhaust the IDEA's administrative process by filing a complaint, but then shifted midstream to judicial proceedings. <u>Id.</u> at 757.

The Third Circuit has interpreted <u>Fry</u>'s use of the word "gravamen"[4] to mean that "a court must review both the entire complaint and each claim to determine if the plaintiff seeks relief for the denial of a FAPE." <u>Wellman v. Butler Area Sch. Dist.</u>, 877 F.3d 125, 133 (3d Cir. 2017). Consideration of the "actual claims" is necessary to ensure that claims arising from the same events, but not involving a FAPE, do not "get swept up and forced into administrative proceedings" along with claims that do. <u>Id.</u> at 132. Ultimately, "[w]hat matters is the crux . . . of the plaintiff's complaint, setting aside any attempts at artful pleading." <u>Id.</u> (quoting <u>Fry</u>, 137 S. Ct. at 755).

Repeatedly, the Third Circuit and district courts therein have found that certain claims alleging discrimination under the ADA or Title VI or violations of the Rehabilitation Act were subject to the IDEA's exhaustion requirement. <u>See, e.g.</u>, <u>Wellman</u>, 187 F.3d at 133 (finding that where all of the plaintiff's grievances—including those under the ADA and Rehabilitation Act—

---

[4]     The gravamen is "[t]he substantial point or essence of a claim, grievance, or complaint." <u>Black's Law Dictionary</u> (11th ed. 2019).

"stem from the alleged failure to accommodate his condition and fulfill his education needs," they were subject to IDEA exhaustion); J.L. by and through Leduc v. Wyoming Valley West Sch. District., 722 F. App'x 190, 192–93 (3d Cir. 2018) (finding that plaintiff's claims for negligence and for violations of the IDEA, § 504 of the Rehabilitation Act, and the Due Process Clause— premised on the school's use of restraints on plaintiff during transportation to and from school— all sought relief for denial of FAPE and, thus, were subject to the exhaustion requirement); S.D. by A.D. v. Haddon Heights Bd. of Educ., 722 F. App'x 119, 126 (3d Cir. 2018) (finding that plaintiffs' discrimination and retaliation claims were subject to the IDEA exhaustion requirement as they arose from educational harms); Henry v. Sch. Dist. of Phila., No. 19-1115, 2019 WL 4247914, at *8–9 (E.D. Pa. Sept. 6, 2019) (finding that where all claims in a complaint focused on the denial of educational opportunities, the gravamen of the claims was a denial of a FAPE and, thus, all claims were subject to IDEA's exhaustion).

The application of the Fry test to Plaintiffs' Amended Complaint and to each of their claims against the School District demonstrates that Plaintiffs' grievances arise from and seek relief for the alleged denial of the Plaintiff Parents' right to meaningful participation in their children's IEP. The Amended Complaint, as a whole, was brought as a putative class action, alleging that the School District's refusal to provide sufficient interpretation and to complete and timely translate IEP process documents and regular education forms for parents who are LEP "violates the IDEA, ADA, Section 504, the EEOA, Title VI, and provisions of Chapter 14, Chapter 15, and Chapter 4 of the Pennsylvania School Code." (Am. Compl. ¶ 53.) The factual allegations then focus purely on how the School District's failure to provide appropriate interpretation and translation services has affected its ability to ensure students receive their federally mandated educations.

Each count of the Amended Complaint then repeats these allegations under the guise of a different statutory provision. Count Three—alleging a violation of Section 504 of the Rehabilitation Act, ADA, and 22 Pa. Code Chapter 15—states that "[b]y failing to translate regular education forms for the members of the Parent Class, including homebound forms and information about those services, the District has substantially undermined the ability of members of the Student class to receive equal access to education services on the same basis as students without disabilities." (Id. ¶ 121.) Count Four—alleging discrimination under the EEOA—contends that the School District has "denied equal education opportunity to Student Plaintiffs and members of the Student Class on account of their race and/or national origin or that of their parents by failing to take appropriate action to overcome language barriers of these students and/or their parents . . . [which] failure has impeded equal participation by Student Plaintiffs and the members of the Student Class in the District's special education and other instructional programs." (Id. ¶ 125.) Count Five—alleging violation of Title VI of the Civil Rights Act—rests on the assertion that "[t]he failure to assist Parent Plaintiffs, members of the Parent Class, Student Plaintiffs, and members of the Student Class who are LEP to participate effectively in or benefit from federal assisted programs and activities [by providing parents with complete and timely translation of IEP process documents] violate[s] . . . Title VI [and requires the School District to] take appropriate action to ensure that such persons have meaningful access to the programs, services, and information those recipients provide." (Id. ¶¶ 130, 133.) Count VI—alleging violation of 22 Pa. Code Chapter 14—posits that "[b]y its failure to provide sufficient oral interpretation and complete and timely translated IEP process documents, the District has violated and is continuing to violate the IDEA and Chapter 14." (Id. ¶ 137.) Finally, Count Seven asserts that the School District has

violated 22 Pa. Code Chapter 15 "[b]y failing to provide complete and timely translated regular education forms as defined herein, including those for home instruction."  (Id. ¶ 140.)

In the "Relief Requested" section of the Amended Complaint, Plaintiffs seek the same relief for every Count of the Amended Complaint.  They demand no monetary or other compensatory relief.  Rather, they request a generalized injunction that the School District develop protocols to identify all LEP parents, deliver IEP process documents to such parents in their appropriate native language, and provide appropriate translation services.  (Am. Compl., Relief Requested Clause.)

Finally, the history of the proceedings indicates that Plaintiffs' claims against the School District all concern the denial of FAPE.  Although Plaintiffs Lin and R.H. did not raise claims to an administrative hearing officer, they requested mediation through the Office for Dispute Resolution, which resulted in a mediation agreement between Ms. Lin and the School District.  (DSUF ¶¶ 26–27; PC ¶¶ 26–27.)  Likewise, although Ms. Perez and her children have not raised claims to an administrative hearing officer, Ms. Perez has previously been represented by counsel in raising issues to the School District pertaining to her children's special education services.  (DSUF ¶¶ 36–37, PC ¶¶ 36–37.)

In light of the foregoing, I find that the gravamen of both the Amended Complaint as a whole and the individual claims therein seek relief for denial of a FAPE.  Clearly, (1) Plaintiffs could not have brought the same claims if the conduct occurred at a public facility that was not a school, and (2) a nonstudent visiting the school could not (and would not) advance any of the same claims.  Fry, 137 S. Ct. at 756–67.  Moreover, the Plaintiffs were able to and indeed sought local remedies before shifting to judicial proceedings.  Id. at 757.  Finally, the only relief requested is that which is available under the IDEA.  In short, the entire Amended Complaint and each of the

individual claims stem from the School District's alleged failure to provide adequate translation and interpretation services to allow the Parent Plaintiffs to meaningfully participate in their children's IEP process and to ensure that their children receive a FAPE.  Accordingly, these claims must be dismissed for failure to exhaust administrative remedies.

**IV.    CONCLUSION**

In light of the foregoing, I will grant the School District's Motion for Summary Judgment and enter judgment in its favor on the entirety of the Amended Complaint.  An appropriate Order follows.